# IN THE SUPREME COURT OF IOWA

No. 12–1758

Filed August 16, 2013

**STATE OF IOWA,**

   Appellant,

vs.

**JEFFREY K. RAGLAND,**

   Appellee.

---

Appeal from the Iowa District Court for Pottawattamie County, Timothy O'Grady, Judge.

The State appeals the district court's refusal to sentence defendant in accordance with the Governor's commutation order.  **AFFIRMED.**

Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant Attorney General, Matthew D. Wilber, County Attorney, and Margaret J. Popp-Reyes, Assistant County Attorney, for appellant.

Jon M. Kinnamon of Kinnamon, Kinnamon, Russo, Meyer & Keegan, Cedar Rapids, for appellee.

**CADY, Chief Justice.**

In this appeal, we must decide if the district court erred in resentencing a defendant who was convicted as a juvenile of first-degree murder and mandatorily sentenced to life without parole after he claimed his sentence violated the constitutional prohibition against cruel and unusual punishment and after the Governor of Iowa commuted the sentence to sixty years without parole. We conclude the district court properly resentenced the defendant. We affirm the sentence imposed by the district court.

## I. Background Facts and Proceedings.

Jeffrey Ragland was seventeen years old in 1986 when he and two friends attacked another group of boys in a grocery store parking lot in Council Bluffs. Ragland instigated the fight by making aggressive comments, while the boys in the other group attempted to avoid a conflict. Moments before the confrontation turned tragic, Ragland yelled either "Let's do it" or "We're gonna fight." One of the boys with Ragland then promptly swung a tire iron he was carrying and struck one of the boys in the other group, Timothy Sieff, in the head. Sieff fell to the ground and subsequently died from the blow.

Ragland was charged with first-degree murder for Sieff's death and was prosecuted as an adult. Following a jury trial, he was found guilty of first-degree murder under the felony-murder doctrine. The district court then sentenced Ragland to a term of life in prison without parole. The sentence was mandatory under Iowa law. *See* Iowa Code § 902.1 (2013).[1]

---

[1]The version of the Code in effect at the time of the homicide was the 1987 Code. However, no relevant, substantive changes have been made, and for purposes of this opinion, we will refer to the 2013 Code unless otherwise indicated.

Ragland has been incarcerated in the state penal system since his conviction. Now forty-four years old, he has pursued numerous postconviction relief actions in state and federal court during his imprisonment, including an application to correct his sentence. In 2012, we responded to this application by directing the district court to consider whether the mandatory life sentence without parole Ragland was serving constituted cruel and unusual punishment under the State and Federal Constitutions. We remanded the case to the district court to conduct a hearing on the question.[2] *State v. Ragland,* 812 N.W.2d 654, 659 (Iowa 2012).

On June 25, 2012, shortly after our directive for the district court to consider the constitutionality of Ragland's sentence, but prior to the hearing, the United States Supreme Court decided *Miller v. Alabama,* 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The Court held the Eighth Amendment prohibited "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. The Court found that defendants who committed homicide crimes as juveniles and faced a sentence of life without parole were entitled to a sentencing hearing that would permit the sentencing court to consider the individual characteristics of the defendant and the individual circumstances of the crime as mitigating factors for a lesser sentence. *See id.* at ___, 132 S. Ct. at 2475, 183 L. Ed. 2d at 418.

---

[2]In *Veal v. State*, we determined a challenge to a sentence of life without the possibility of parole is a challenge to an illegal sentence and thus not subject to the three-year statute of limitations for postconviction relief actions. 779 N.W.2d 63, 65 (Iowa 2010). In *State v. Bruegger*, we held a defendant may now mount an as-applied challenge to his or her sentence as cruel and unusual. 773 N.W.2d 862, 884 (Iowa 2009).

The district court scheduled a hearing on the application for resentencing filed by Ragland for August 28. On July 26, however, the Governor of Iowa commuted Ragland's sentence, as well as the sentences of thirty-seven other inmates in Iowa's prison system who, like Ragland, had received statutorily mandated sentences of life without parole for crimes committed as juveniles. For all thirty-eight defendants, the Governor commuted the sentences to life with no possibility for parole for sixty years and directed that no credit be given for earned time. The full text of the commutation provides:

> WHEREAS, in the recent case of *Miller v. Alabama* the United States Supreme Court ruled that states cannot mandate life sentences without the possibility of parole for murderers who committed their crimes before the age of eighteen; and
>
> WHEREAS, now after the Court's ruling, up to 38 dangerous juvenile murderers will seek resentencing and more lenient sentences; and
>
> WHEREAS, it is a serious violation of federalism for the federal supreme court to throw out long-standing Iowa sentences; and
>
> WHEREAS, the Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments," which allows the Court to ensure the method of punishment does not violate constitutional rights, but does not allow them to substitute their own judgment for that of the duly-elected legislature on issues of proportionality and public safety; and
>
> WHEREAS, in the *Miller v. Alabama* opinion the Court used "evolving standards of decency that mark the progress of a maturing society" to justify their decision, but ignored the fact that first degree murder itself violates the most fundamental right of a free society—the right to live; and
>
> WHEREAS, unlike elected and accountable Iowa legislators, the Supreme Court has not had the opportunity to hear from the friends and family members of the victims of first degree murderers, nor do they live in the Iowa communities affected by their ruling; and
>
> WHEREAS, first degree murder is an intentional and premeditated crime and those who are found guilty are

> dangerous and should be kept off the streets and out of our communities; and
>
> WHEREAS, the penalty for second degree murder, a lesser offense, is fifty years in prison; and
>
> WHEREAS, an appropriate sentence for first degree murder is life in prison, evidenced by the fact that when the General Assembly changed criminal penalties for other crimes committed before the age of eighteen the sentence for first degree murder was not changed; and
>
> WHEREAS, after the decision in *Miller v. Alabama*, the decision about whether a juvenile first degree murderer will be released, or remain in prison, is taken away from the legislature, and given to judges, it is imperative that action is taken to ensure our public safety.
>
> KNOW YE, that by virtue of the authority vested in me by the laws of the Constitution of the State of Iowa, I, Terry E. Branstad, Governor of the State of Iowa, do hereby COMMUTE the sentence of Jeffrey K. Ragland #0803013, who after being found guilty of the crime of Murder in the First Degree in violation of Iowa Code section 707.2 from events occurring on or about August 16, 1986 was transferred by order of the Pottawattamie County Court to the custody of the Iowa Department of Corrections for a term of imprisonment of life without opportunity for parole, to a term of life with no possibility for parole or work release for sixty (60) actual years, with no credit for earned time.

At the hearing before the district court on August 28, Ragland argued he should still be resentenced under *Miller*. He claimed the commutation of his sentence by the Governor was unconstitutional because it failed to follow the individualized considerations mandated by *Miller*.

Several persons testified at the resentencing hearing that they believed Ragland's sentence should be lessened. John Nelson Sr., owner of a business called SilverStone Group, testified he had hired one of Ragland's codefendants, Robert Lamkins, following the incident. Lamkins worked in Nelson's office, and Nelson helped Lamkins pay for college. Nelson considered Lamkins a successful rehabilitation. Nelson

testified he would gladly hire Ragland upon release from prison. Patrick Hanafan, Mayor of Council Bluffs, also voiced testimony supportive of Ragland's release from prison.

Ragland's brother, Ronald Ragland Jr., testified that a support network would be in place for Ragland upon Ragland's release, as well as living arrangements and a vehicle. Additionally, he testified that he has developed a friendship with the victim's older brother, Ben.

Ragland's companions during the fateful fight in 1986, Matt Gill and Robert Lamkins, sent letters to County Attorney Matt Wilber. Gill's letter is particularly poignant. Gill wrote that he was "solely responsible for the death of Timothy Sieff." He expressed remorse for causing Sieff's death and stated that he pled guilty to second-degree murder and served just three years in prison. He continued:

> As I understand it, part of the rationale for [charging Ragland with first-degree murder] from the prosecutor at the time is that Jeff Ragland was painted as the "Ring Leader" and the prosecutor believed that the fight would not have happened if it were not for Jeff being there. At times they made it sound like the rest of us that were there that night were somehow victims of being in the wrong place at the wrong time and had the bad luck of being with Jeff Ragland who was just out looking for a fight. This is just absolutely not true. Jeff was not a "Ring Leader" who somehow caused us to be willing and ready to get into a fight that we would have otherwise never engaged in. The time and place in which we grew up coupled with the fact that we were young, impulsive 17 year olds with poor judgment are the reasons we were willing to engage in a fight, not because we were unlucky enough to be with Jeff Ragland. In fact, looking back on it now it is glaringly obvious that it was Jeff who was unlucky to be with me that night, not the other way around. Jeff had only been with us for less than 30 minutes that night, yet he is still in prison 26 years later because of the terrible decisions I made.

Gill closed by conveying gratitude for the second chance he received. He also expressed hope that Ragland would receive a similar opportunity for rehabilitation. "Keeping Jeff Ragland in prison will . . .

not bring back Timothy Sieff or undo what was done on that terrible night in 1986," Gill wrote. "How can it be that I, the person who is actually directly responsible for Timothy Sieff's death was given a second chance and am allowed to live freely in society, but Jeff Ragland is not?"

After considering the testimony provided at the hearing, the district court found the Governor exceeded his authority by commuting the sentence because the commutation circumvented the individualized sentencing required under *Miller* and deprived Ragland of a meaningful opportunity to demonstrate his maturity and rehabilitation. The district court resentenced Ragland to life in prison with the possibility of parole after twenty-five years.[3] Consequently, the new sentence imposed by the district court made Ragland immediately eligible for parole.

The State sought discretionary review, which we granted. On review, the State argues that the Governor was authorized to commute the sentence and the district court was required to accept the commuted sentence as the launching point for the application for resentencing. Thus, the State argues Ragland was no longer serving a life sentence without parole at the time of resentencing, and the individualized sentencing considerations of *Miller*, accordingly, were no longer applicable to him. As a result, the State contends resentencing was improper because the sentence that Ragland was serving was no longer illegal. Ragland argues the Governor had no authority to use his

---

[3]The district court also found the legislature had amended section 902.1 in 2011 to require that juveniles be eligible for parole after twenty-five years. 2011 Iowa Acts ch. 131, § 147 (codified at Iowa Code § 902.1(2)(*a*) (Supp. 2011)). Thus, the district court reasoned, "The Commutation of Sentence to Ragland exceeds the Governor's authority." Consequently, the district court refused to give effect to the commutation order and held that Ragland's December 15, 1986 sentence violated the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution.

commutation powers to circumvent the constitutional requirements of *Miller* that entitled him to be resentenced by the court under a process that would consider and account for the individualized attributes of youth in mitigation of punishment. Ragland, however, did not challenge the new sentence imposed by the district court.

## II. Scope of Review.

A challenge to an illegal sentence is reviewed for correction of legal errors. *State v. Valin*, 724 N.W.2d 440, 444 (Iowa 2006); *see also* Iowa R. App. P. 6.907. When, as here, the defendant mounts a constitutional challenge to an allegedly illegal sentence, the standard of review is de novo. *State v. Oliver*, 812 N.W.2d 636, 639 (Iowa 2012); *State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009).

Ragland challenges his sentence under both the Eighth Amendment to the United States Constitution[4] and article I, section 17 of the Iowa Constitution.[5] Ragland does not suggest application of a standard under article I, section 17 other than the standard employed by the United States Supreme Court under the Eighth Amendment. Accordingly, we use the federal substantive standard of cruel and unusual punishment but reserve the right to apply the standard in a more stringent fashion than federal precedent. *See Bruegger*, 773 N.W.2d at 883.

---

[4]The Eighth Amendment reads, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[5]Article I, section 17 of the Iowa Constitution provides, "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." Iowa Const. art. I, § 17.

**III. Discussion.**

The State argues *Miller* does not apply to Ragland because the Governor commuted the sentence to a term less than life without parole. Ragland argues both his original sentence and his sentence, as commuted, are unconstitutional. Ragland's argument is built on the premise that *Miller* applies retroactively on collateral review of other mandatory life-without-parole sentences for defendants who committed a homicide as a juvenile. Thus, we must first determine if *Miller* applies retroactively.

**A. Retroactive Application of *Miller*.** We recognize an absence of definite authority addressing whether *Miller* applies retroactively to cases on collateral review. Yet, we primarily focus our inquiry on the *Miller* decision itself because equal justice requires that when a new substantive rule is applied to a defendant in the case announcing the new rule, the rule must "be applied retroactively to all who are similarly situated." *Teague v. Lane*, 489 U.S. 288, 300, 109 S. Ct. 1060, 1070, 103 L. Ed. 2d 334, 349 (1989). Thus, it is important to carefully scrutinize the *Miller* decision when considering whether it applies retroactively because a new rule announced by the Supreme Court does not become retroactive by subsequent decisions of other courts, but by the action taken by the Supreme Court in the case announcing the new rule. *Tyler v. Cain*, 533 U.S. 656, 663, 121 S. Ct. 2478, 2482, 150 L. Ed. 2d 632, 642 (2001).

The competing arguments over the retroactivity of *Miller* essentially narrow the inquiry to whether the decision merely established a new penalty-phase procedure for courts to follow before imposing a life sentence without parole for crimes committed by juveniles or whether the decision established either a substantive rule of law or one that

implicates fundamental fairness and accuracy of the criminal proceeding. *See Teague*, 489 U.S. at 307–10, 109 S. Ct. at 1073–75, 103 L. Ed. 2d at 353–56 (discussing two situations in which new constitutional rules will be given retroactive application). Normally, procedural changes do not apply retroactively, while substantive rules of law and watershed rules of criminal procedure have retroactive application. *See Perez v. State*, 816 N.W.2d 354, 358 (Iowa 2012).

In *Miller*, the Court held that mandatory sentences of life without parole are unconstitutional for juveniles prosecuted as adults. 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. The decision is rooted in the Eighth Amendment and built primarily on the Court's prior jurisprudence in *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); and *Thompson v. Oklahoma*, 487 U.S. 815, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988). *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2463, 183 L. Ed. 2d at 417–18. These decisions identified "two strands of precedent" reflecting a need for "proportionate punishment." *Id.* at ___, 132 S. Ct. at 2463, 183 L. Ed. 2d at 417.

The first strand of cases involved "categorical bans on sentencing practices based on mismatches between culpability of a class of offenders and the severity of a penalty." *Id.*; *see also Graham*, 560 U.S. at ___, 130 S. Ct. at 2034, 176 L. Ed. 2d at 850 ("The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."); *Kennedy v. Louisiana*, 554 U.S. 407, 446, 128 S. Ct. 2641, 2664, 171 L. Ed. 2d 525, 555 (2008) (holding the Eighth Amendment forbids imposition of the death penalty for crimes in which the offender did not kill the victim or intend the victim to die); *Roper*, 543 U.S. at 578, 125 S. Ct. at 1200, 161 L. Ed. 2d at 29 ("The Eighth and

Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."); *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 2252, 153 L. Ed. 2d 335, 350 (2002) ("[W]e . . . conclude . . . the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S. Ct. 2595, 2599, 91 L. Ed. 2d 335, 344 (1986))); *Thompson*, 487 U.S. at 838, 108 S. Ct. at 2700, 101 L. Ed. 2d at 720 ("[T]he Eighth and Fourteenth Amendments prohibit the execution of a person who was under 16 years of age at the time of his or her offense.").

The second strand of cases prohibited mandatory capital punishment by "requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2463–64, 183 L. Ed. 2d at 418; *see also Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964–65, 57 L. Ed. 2d 973, 990 (1978) ("[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Footnote omitted.)); *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944, 961 (1976) ("[W]e believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (Citation omitted.)).

To implement its substantive constitutional prohibition against mandatory life-without-parole sentences, *Miller* requires courts to establish a procedure providing for an individualized sentencing hearing tailored to the unique attributes of juveniles when prosecuted as adults for homicide and facing a sentence of life without parole.[6] *See* 567 U.S. at \_\_\_, 132 S. Ct. at 2471, 183 L. Ed. 2d at 426. While *Graham* flatly prohibits the imposition of a life-without-parole sentence for a nonhomicide crime committed by a juvenile in order to afford the juvenile a meaningful opportunity to gain release in the future based on maturity and rehabilitation, 560 U.S. at \_\_\_, 130 S. Ct. at 2030, 176 L. Ed. 2d at 846, *Miller* prohibits mandatory life-without-parole sentences for juveniles, but would seemingly permit life-without-parole sentences that are not mandated by statute if the sentencing court has the power to consider the attributes of youth in the mitigation of punishment, *see* 567 U.S. at \_\_\_, 132 S. Ct. at 2469, 183 L. Ed. 2d at 423–24.

From a broad perspective, *Miller* does mandate a new procedure. Yet, the procedural rule for a hearing is the result of a substantive change in the law that prohibits mandatory life-without-parole sentencing. Thus, the case bars states from imposing a certain type of punishment on certain people. *See Schriro v. Summerlin*, 542 U.S. 348, 352, 124 S. Ct. 2519, 2522, 159 L. Ed. 2d 442, 448 (2004) (recognizing

---

[6]In *Miller*, the Court described the factors that the sentencing court must consider at the hearing, including: (1) the "chronological age" of the youth and the features of youth, including "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the "family and home environment" that surrounded the youth; (3) "the circumstances of the homicide offense, including the extent of [the youth's] participation in the conduct and the way familial and peer pressures may have affected [the youth]"; (4) the "incompetencies associated with youth—for example, [the youth's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the youth's] incapacity to assist [the youth's] own attorneys"; and (5) "the possibility of rehabilitation." *Miller*, 567 U.S. at \_\_\_, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423.

rules placing certain groups beyond the power of the state to punish are given retroactive application). "Such rules apply retroactively because they 'necessarily carry a significant risk that a defendant' . . . faces a punishment that the law cannot impose upon him." *See id.* at 352, 124 S. Ct. at 2522–23, 159 L. Ed. 2d at 448 (quoting *Bousley v. United States*, 523 U.S. 614, 620, 118 S. Ct. 1604, 1610, 140 L. Ed. 2d 828, 838–39 (1998)).

More specifically, the cases used by the Court in *Miller* to support its holding have been applied retroactively on both direct and collateral review. *See In re Sparks*, 657 F.3d 258, 261–62 (5th Cir. 2011) (indicating *Graham* was made retroactive on collateral review by the Supreme Court as a matter of logical necessity under *Tyler*); *see also Tyler*, 533 U.S. at 669, 121 S. Ct. at 2486, 150 L. Ed. 2d at 646–47 (O'Connor, J., concurring) (describing the syllogistic relationship between *Teague*'s exception to nonretroactivity for rules placing certain conduct beyond the power of the state to proscribe and subsequent cases that fit into *Teague*'s exception); *Penry v. Lynaugh*, 492 U.S. 302, 330, 109 S. Ct. 2934, 2953, 106 L. Ed. 2d 256, 285 (1989) ("[T]he first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense."), *abrogated on other grounds by Atkins*, 536 U.S. at 321, 122 S. Ct. at 2252, 153 L. Ed. 2d at 350. We joined this discourse three years ago when we held *Graham* applied retroactively. *Bonilla v. State*, 791 N.W.2d 697, 700–01 (Iowa 2010). This practical observation of the treatment of the underlying authority of *Miller* is instructive. If a substantial portion of the authority used in

*Miller* has been applied retroactively, *Miller* should logically receive the same treatment.

The procedural posture of the *Miller* decision further supports retroactive application. *Miller* involved the companion case of *Jackson v. Hobbs. See Miller*, 567 U.S. at ___, 132 S. Ct. at 2461–62, 183 L. Ed. 2d at 415–16. *Miller* was a direct appeal, but *Jackson* involved a petition for habeas corpus brought after the conviction had been affirmed on direct appeal. *See id.* Nevertheless, the Supreme Court specifically held the new rule applied not only to the defendant in *Miller*, but also to the defendant in *Jackson* on collateral review. *See id.* at ___, 132 S. Ct. at 2475, 183 L. Ed. 2d at 430. The Court directed that the defendant in *Jackson* be given an individualized hearing. *See id.* There would have been no reason for the Court to direct such an outcome if it did not view the *Miller* rule as applying retroactively to cases on collateral review. We also recognize that the dissent in *Miller* suggested the majority's decision would invalidate other cases across the nation. *See id.* at ___, 132 S. Ct. at 2479–80, 183 L. Ed. 2d at 433 (Roberts, C.J., dissenting). Again, the dissent would not have raised this concern if the Court did not believe its holding applied to cases on collateral review.

Some courts in other jurisdictions agree that *Miller* applies retroactively to defendants whose direct appeals have been exhausted. *See People v. Williams*, 982 N.E.2d 181, 196–97 (Ill. App. Ct. 2012); *State v. Simmons*, 99 So. 3d 28 (La. 2012); *Jones v. State*, ___ So. 3d ___, ___, 2013 WL 3756564, at *5 (Miss. 2013). A panel for the Eighth Circuit permitted a prisoner to raise a second or successive challenges to his sentence based on *Miller*, reasoning the prisoner successfully made out a prima facie case that *Miller* articulated "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that

was previously unavailable." *See Johnson v. United States*, 720 F.3d 720, 720 (8th Cir. 2013) (per curiam); *see also* 28 U.S.C. § 2255(h)(2) (2006 & Supp. III 2010) (permitting prisoners to file second or successive challenges to their sentences when their sentence is in violation of "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable"). Other jurisdictions have held *Miller* applies retroactively in a temporal sense at least to cases currently on direct appeal, without further considering whether *Miller* applies retroactively to all defendants. *Commonwealth v. Lofton*, 57 A.3d 1270, 1276 & n.2 (Pa. 2012) (holding *Miller* created a new rule and applies to all cases pending on direct appeal); *People v. Banks*, ___ P.3d ___, ___, 2012 WL 4459101, at *20 (Colo. App. 2012) (same). In contrast, other jurisdictions have held *Miller* does not recognize a new substantive rule of law under the Eighth Amendment but simply requires a new procedure; accordingly, those courts have held *Miller* is not retroactive. *See, e.g.*, *In re Morgan*, 713 F.3d 1365, 1367–68 (11th Cir. 2013); *Craig v. Cain*, No. 12–30035, 2013 WL 69128, at *2 (5th Cir. Jan. 4, 2013) (unpublished opinion); *Geter v. State*, 115 So. 3d 375, 385 (Fla. Dist. Ct. App. 2012); *People v. Carp*, 828 N.W.2d 685, 715 (Mich. Ct. App. 2012).

On balance, we think the best analysis of the issue is found in an article by Dean Erwin Chemerinsky. He stated:

> There is a strong argument that *Miller* should apply retroactively: It says that it is beyond the authority of the criminal law to impose a mandatory sentence of life without parole. It would be terribly unfair to have individuals imprisoned for life without any chance of parole based on the accident of the timing of the trial.
>
> . . . .

> . . . [T]he *Miller* Court did more than change procedures; it held that the government cannot constitutionally impose a punishment. As a substantive change in the law which puts matters outside the scope of the government's power, the holding should apply retroactively.

Erwin Chemerinsky, *Chemerinsky: Juvenile Life-Without-Parole Case Means Courts Must Look at Mandatory Sentences*, A.B.A. J. Law News Now, (Aug. 8, 2012, 8:30 AM), http://www.abajournal.com/news/article/Chemerinsky_juvenile_life-without-parole_case_means_courts_must_look_at_sen/.

Accordingly, we hold *Miller* applies retroactively. We next consider whether Ragland's sentence, as commuted by the Governor, rendered *Miller* inapplicable to Ragland.

**B. Effect of Commutation.** Ragland primarily argues he is entitled to the constitutional benefits of *Miller* because the Governor was not authorized to commute his sentence so as to avoid *Miller*'s application. The State responds by claiming the district court unconstitutionally intruded on the authority of the Governor by refusing to give effect to the commutation.

It is a fundamental principle that one branch of government is not permitted to intrude upon the powers of another branch of government. This principle is inscribed in article III, section 1 of our Iowa Constitution. Yet, we have also recognized that the separation of powers doctrine is not drawn with "rigid boundaries." *Klouda v. Sixth Judicial Dist. Dep't of Corr. Servs.*, 642 N.W.2d 255, 260 (Iowa 2002). "Instead, some acts can be properly entrusted to more than one branch of government, and some functions inevitably intersect." *State v. Hoegh*, 632 N.W.2d 885, 889 (Iowa 2001). This observation underscores an often overlooked, but important, principle of good governance, which is

that "harmonious cooperation among the three branches of government is fundamental to our system of government." *Webster Cnty. Bd. of Supervisors v. Flattery*, 268 N.W.2d 869, 874 (Iowa 1978). The construct of the separation of powers doctrine reveals that two branches of government can both be properly exercising their powers while working in the same arena.

Our constitution grants the Governor broad authority concerning commutations and pardons. Article IV, section 16 specifically provides that "[t]he governor shall have power to grant reprieves, commutations and pardons, after conviction, for all offences except treason and cases of impeachment, subject to such regulations as may be provided by law." Iowa Const. art. IV, § 16.

A commutation, the action taken by the Governor in this case, is "[t]he executive's substitution in a particular case of a less severe punishment for a more severe one that has already been judicially imposed on the defendant." *Black's Law Dictionary* 318 (9th ed. 2009); *see also People v. Mata*, 842 N.E.2d 686, 691 (Ill. 2005) ("[I]t is axiomatic from the plain language of this constitutional provision that the Governor cannot use the commutation power to *increase* a defendant's punishment." (Emphasis added.)); *Lee v. Murphy*, 63 Va. (22 Gratt.) 789, 798 (1872) ("A commutation is the substitution of a less for a greater punishment . . . ."). The power to commute sentences includes the power to impose "conditions which do not in themselves offend the Constitution, but which are not specifically provided for by statute." *Schick v. Reed*, 419 U.S. 256, 264, 95 S. Ct. 379, 384, 42 L. Ed. 2d 430, 437 (1974). Yet, the power to commute a sentence is not without limitation and does not foreclose legal challenges. *See Arthur v. Craig*, 48

Iowa 264, 268 (1878); *see also* Iowa Const. art. IV, § 16 (stating the power to commute is subject to regulations provided by law).

Nevertheless, we do not believe it is necessary to traipse into this constitutional thicket. If possible, we should avoid constitutional confrontation between two branches of government. *See, e.g., Schwarzkopf v. Sac Cnty. Bd. of Supervisors*, 341 N.W.2d 1, 6 (Iowa 1983) ("We must, of course, guard against overextension of legislative powers; we must also, however, avoid our own infringement upon the constitutional powers of the legislature in our efforts to protect our own.").

Even if we accept that the Governor had the authority to exercise the power to commute under the circumstances of this case, the question remains whether the commuted sentence amounts to mandatory life without parole. If so, *Miller* applied, and the district court was required to resentence Ragland after providing the individualized sentencing hearing.

*Miller* applies to life sentences without parole that were mandatorily imposed. Thus, we must consider if Ragland is serving a life sentence without parole and if his sentence was mandatory. We first consider the mandatory nature of the sentence.

Murder in the first degree is a class "A" felony in Iowa. Iowa Code § 707.2(6). The only sentence provided by our legislature for a class "A" felony is for the offender to be committed to the department of corrections "for the rest of the defendant's life." *Id.* § 902.1(1). No other sentencing option is available. *See id.* The sentencing court has no power to defer the judgment, defer the sentence, suspend the sentence, or reconsider the sentence. *Id.* Additionally, the defendant cannot "be released on parole unless the governor commutes the sentence to a term

of years." *Id.* This sentencing scheme was in place when Ragland received his sentence, just as it is today. *Compare* Iowa Code § 902.1 (1987), *with id.* § 902.1(1) (2013).

Clearly, the original sentence imposed on Ragland by the district court was a mandatory sentence. The sentencing court had no other option but to impose the one sentence provided by law. This result is important in the analysis because it goes to the heart of *Miller*, which states that "children are constitutionally different from adults for purposes of sentencing," and a mandatory life sentence without parole imposed on juveniles means young offenders "die in prison even if [the sentencing judge] would have thought that his youth and its attendant characteristics . . . made a lesser sentence . . . more appropriate." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460, 2464, 183 L. Ed. 2d at 414, 418. Importantly, the mandatory penalty component totally precludes the sentencing court from taking the critical aspects of youth into account in the imposition of a sentence. *Id.* at ___, 132 S. Ct. at 2466, 183 L. Ed. 2d at 420.

The commutation by the Governor of Ragland's sentence to a term of years did not affect the mandatory nature of the sentence or cure the absence of a process of individualized sentencing considerations mandated under *Miller*. *Miller* protects youth at the time of sentencing. *See id.* at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 422–23 (explaining the factors that must be considered by the sentencing court at the time of sentencing). Even with the commutation in 2012 by the Governor,

Ragland has been deprived of the constitutional mandate that youths be sentenced pursuant to the *Miller* factors.[7]

Having concluded Ragland is serving a mandatory sentence, we next analyze whether the sentence, as commuted, remains a life-without-parole sentence targeted by *Miller*. One question that has clearly emerged following *Miller* is whether its mandates apply not only to mandatory life sentences without parole, but also to the practical equivalent of life-without-parole sentences. This is an issue that has been presented to us in various forms in other recent cases in which we have attempted to develop the proper constitutional framework for the sentencing of juvenile offenders as adults. *See State v. Null*, 836 N.W.2d 41, 45–77 (Iowa 2013); *State v. Pearson*, 836 N.W.2d 88, 89–98 (Iowa 2013).

Ragland must serve sixty years of his sentence before he may be considered for parole. While this sentence is not a life term, Ragland will not be eligible for parole until he is seventy-eight years old. Under standard mortality tables, his life expectancy is 78.6 years. Ragland argues his sentence is the functional equivalent of life without parole. The State responds that the dictates of *Miller* do not apply because

---

[7]The upshot of *Miller* was to render state statutes such as Iowa Code section 902.1 unconstitutional as applied to juvenile offenders tried as adults and convicted of a class "A" felony because of the mandatory nature of the life-without-parole sentence imposed by the statute. The *Miller* procedure cures the unconstitutional aspect of such statutes as applied to juvenile offenders until amended by the legislature to establish a different constitutional procedure. *See Parker v. State*, 119 So. 3d 987, 998 (Miss. 2013). The Iowa legislature amended section 902.1 in 2011 to make juveniles eligible for parole after twenty-five years. *See* 2011 Iowa Acts ch. 131, § 147(2)(*a*). By its terms, section 902.1(2)(*a*) does not apply to juveniles convicted of first-degree murder, such as Ragland. Iowa Code § 902.1(2)(*c*). The impact of this amendment is not before us in this case.

Ragland has a chance of becoming eligible for parole during his natural lifetime under the commuted sentence.

The precise question we now consider is one not many other courts have confronted. It is unique and comes before us due to the post-*Miller* intervention of a commutation of the sentence from life without parole to life without parole for sixty years. Thus, we look to analogous circumstances to help decide the question.

Some courts in other states have observed in addressing the new sentencing process following *Miller* that the mere possibility of parole for a juvenile offender sentenced by the court to life without parole, provided by the overall sentencing scheme through clemency or commutation, does not mean the sentence avoids the mandates of *Miller* as a life sentence with parole. *See Parker v. State*, 119 So. 3d 987, 997 (Miss. 2013) (holding a life sentence with an opportunity for "conditional release" on parole at age sixty-five falls within *Miller*); *Bear Cloud v. State*, 294 P.3d 36, 45 (Wyo. 2013) (holding a life sentence that provides an opportunity for parole only upon commutation of the sentence to a term of years by the governor is practically identical to life imprisonment without parole). The mere possibility of commutation or clemency is fundamentally distinct from the eligibility for parole and does not leave a juvenile offender a meaningful opportunity to avoid a lifetime of incarceration. *See Solem v. Helm*, 463 U.S. 277, 300–01, 103 S. Ct. 3001, 3015, 77 L. Ed. 2d 637, 656 (1983) (distinguishing the constitutional impact of parole eligibility and the possibility of commutation because "[p]arole is a regular part of the rehabilitative process," but a "[c]ommutation, on the other hand, is an *ad hoc* exercise of executive clemency").

Yet, an early split in authority has emerged among other courts over the question of whether *Graham* applies to long sentences that are less than life without parole. In *People v. Caballero*, the California Supreme Court held a 110-year-to-life sentence contravened the mandate of *Graham* that the Eighth Amendment requires a " 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " 282 P.3d 291, 296 (Cal. 2012) (quoting *Graham*, 560 U.S. at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46). The court found the bar on life-without-parole sentences under *Graham* included sentences for a term of years that amounted "to the functional equivalent of a life without parole sentence." *Id.* at 295. In *People v. Rainer*, a Colorado court held a sentence for a term of years that does not offer the possibility of parole until after life expectancy also violates the mandate in *Graham* for a meaningful opportunity to obtain release. ___ P.3d ___, ___, 2013 WL 1490107, at *4 (Colo. App. 2013).

On the other hand, in *Bunch v. Smith*, the Sixth Circuit Court of Appeals held that *Graham* did not apply to a juvenile sentence to consecutive terms totaling eighty-nine years. 685 F.3d 546, 550–51 (6th Cir. 2012), *cert. denied*, 569 U.S. ___, 133 S. Ct. 1996 (2013). The Sixth Circuit simply employed a strict reading of *Graham* and limited the holding in *Graham* to scenarios dealing with life-without-parole sentences. *See id.*; *see also State v. Kasic*, 265 P.3d 410, 414–16 (Ariz. Ct. App. 2011) (rejecting juvenile defendant's argument that thirty-two consecutive sentences, which in the aggregate exceeded the defendant's normal life expectancy, constituted a de facto life sentence); *Henry v. State*, 82 So. 3d 1084, 1089 (Fla. Dist. Ct. App. 2012) (rejecting defendant's argument that nine sentences, which in the aggregate

constituted 107 years of incarceration without the possibility of parole, constituted a de facto life sentence).

We acknowledge the Court denied certiorari in *Bunch*; however, the Court in *Bunch* was confined to a very narrow standard of review. The Antiterrorism and Effective Death Penalty Act of 1996 allowed the Court to grant habeas corpus relief only if the state court decision on review was contrary to clearly established federal law or was an unreasonable application of federal law. 28 U.S.C. § 2254(d)(1) (2006). The acknowledged split of authority reveals that the argument made by the defendant in *Bunch* for a virtual life sentence was not clearly established. *See Bunch*, 685 F.3d at 552; *see also Rainer*, ___ P.3d at ___, 2013 WL 1490107, at *9–10 (reviewing and summarizing the split of authority over the question of whether *Graham* should apply to sentences for a term of years that are not materially distinguishable from life without parole). Thus, the narrow standard of review would not have permitted the United States Supreme Court to fully address the issues on certiorari.

For all practical purposes, the same motivation behind the mandates of *Miller* applies to the commuted sentence in this case or any sentence that is the practical equivalent to life without parole. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 (recognizing children's diminished culpability and heightened capacity for change make the harshest penalty appropriate in only certain and uncommon instances). *Graham* requires a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" during the offender's expected lifetime, and *Miller* requires an individualized consideration of youth as a mitigating factor at a sentencing hearing if such a realistic, meaningful opportunity will not be available. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424; *Graham,* 560 U.S. at ___, 130

S. Ct. at 2030, 176 L. Ed. 2d at 845–46. After all, "[l]ife without parole 'forswears altogether the rehabilitative ideal.' It reflects 'an irrevocable judgment about [an offender's] value and place in society,' at odds with a child's capacity for change." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419–20 (quoting *Graham*, 560 U.S. at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845).

Thus, the rationale of *Miller*, as well as *Graham*, reveals that the unconstitutional imposition of a mandatory life-without-parole sentence is not fixed by substituting it with a sentence with parole that is the practical equivalent of a life sentence without parole. Oftentimes, it is important that the spirit of the law not be lost in the application of the law. This is one such time. The spirit of the constitutional mandates of *Miller* and *Graham* instruct that much more is at stake in the sentencing of juveniles than merely making sure that parole is possible. In light of our increased understanding of the decision making of youths, the sentencing process must be tailored to account in a meaningful way for the attributes of juveniles that are distinct from adult conduct. At the core of all of this also lies the profound sense of what a person loses by beginning to serve a lifetime of incarceration as a youth.

In the end, a government system that resolves disputes could hardly call itself a system of justice with a rule that demands individualized sentencing considerations common to all youths apply only to those youths facing a sentence of life without parole and not to those youths facing a sentence of life with no parole until age seventy-eight. Accordingly, we hold *Miller* applies to sentences that are the functional equivalent of life without parole. The commuted sentence in this case is the functional equivalent of a life sentence without parole.

Ragland was originally sentenced without the benefit of an individualized sentencing hearing. The commutation lessened his sentence slightly, but without the court's consideration of any mitigating factors as demanded by *Miller*. While such a review process might still permit a life-without-parole sentence to be imposed in a murder case, it might also result in a sentence far less than life without parole. Thus, Ragland was entitled to be sentenced with consideration of the factors identified in *Miller*. Additionally, he was entitled to be resentenced under the individualized process because *Miller* applies retroactively.

Accordingly, Ragland's commutation did not remove the case from the mandates of *Miller*. The sentence served by Ragland, as commuted, still amounts to cruel and unusual punishment under the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution. Consequently, the district court properly resentenced Ragland in light of *Miller*. Because the new sentence was not challenged on appeal, we do not address it in any way except to reiterate that *Miller* requires individualized resentencing.

## IV. Conclusion.

We affirm the new sentence imposed by the district court following the Governor's commutation of the defendant's sentence.

**AFFIRMED.**

All justices concur, but Wiggins, J., writes separately to concur specially; Mansfield, J., joined by Waterman, J., writes separately to concur specially; and Zager, J., writes separately to concur specially.

**WIGGINS, Justice (concurring specially).**

I join in the majority opinion but write separately to point out some observations concerning whether the Governor has the constitutional authority to commute Ragland's sentence.

After the United States Supreme Court held that sentencing a juvenile to mandatory life in prison without parole is unconstitutional, a question emerged as to whether the Governor can commute such a sentence. In this situation, is the Governor commuting a void sentence or sentencing the defendant for the first time in violation of the separation of powers doctrine? *See Collins v. State*, 550 S.W.2d 643, 654–55 (Tenn. 1977) (Brock, J., dissenting); *Stanley v. State*, 490 S.W.2d 828, 833 (Tex. Crim. App. 1972) (Onion, P.J., dissenting); *cf. Klouda v. Sixth Judicial Dist. Dep't of Corr. Servs.*, 642 N.W.2d 255, 263 (Iowa 2002) (holding the statute granting administrative law judges, who are part of the executive branch, the power to revoke probation violated article III, section 1 of the Iowa Constitution).

Another observation is that the Governor's imposition of a sentence might constitute a denial of due process—such as the right to present evidence at the sentencing stage under article I, section 9 or the right to be informed of accusations, the right to a jury trial, the right to compulsory process, and the right to counsel under article I, section 10 of the Iowa Constitution. *See Rose v. Hodges*, 423 U.S. 19, 26–27, 96 S. Ct. 175, 179–80, 46 L. Ed. 2d 162, 168 (1975) (Brennan, J., dissenting) ("If respondents were 'sentenced' by the Governor, were they denied due process when not afforded [the] opportunity [to present evidence] . . . ?"); *Collins*, 550 S.W.2d at 655 (Brock, J., dissenting) (arguing the commutation procedure deprived the defendant of the right

to a jury trial under Tennessee common law); *Whan v. State*, 485 S.W.2d 275, 280 (Tex. Crim. App. 1972) (Onion, P.J., dissenting) ("To permit the Governor . . . such authority, under the circumstances of this case, would allow them to intervene and prevent a retrial and substitute their idea of what punishment should be assessed rather than a jury . . . .").

My third observation is that a prisoner could also challenge a commutation that required the prisoner to waive his or her constitutional, civil, fundamental, or human rights prospectively. *Cf. State v. Baldon*, 829 N.W.2d 785, 803 (Iowa 2013) (holding parolee's signature on parolee agreement did not establish prospective consent to searches under article I, section 8 of the Iowa Constitution).

My final observation is that the Governor's action may have violated article IV, section 16 of the Iowa Constitution. This provision grants the Governor commutation power, subject to regulations provided by law. Iowa Const. art. IV, § 16. The legislature has regulated the Governor's power to commute a person's sentence by enacting certain legislation regulating his power to commute. The Code provides that "[p]rior to the governor granting a reprieve, pardon, or commutation to an offender convicted of a violent crime, the governor shall notify a registered victim that the victim's offender has applied for a reprieve, pardon, or commutation." Iowa Code § 915.19 (2013). The Code also provides a specific procedure the Governor must follow to commute the sentence of a person who receives a life sentence without the possibility of parole. *Id.* § 902.2. This procedure involves referring the matter to the Iowa Board of Parole before the Governor can commute. *Id.* The record is devoid of any evidence showing the Governor followed any of these legislative enactments.

However, we need not reach these important constitutional issues today and leave them for another day.

**MANSFIELD, Justice (concurring specially).**

The court decides this case on the ground that a mandatory life sentence where the defendant will not be eligible for parole until he has served sixty years in prison is the practical equivalent of mandatory life without parole (LWOP) and thus violates *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). I agree with that conclusion and therefore join the court's opinion. I write separately to respond to the observations in Justice Wiggins's special concurrence regarding the Governor's commutation authority.

First, I do not believe the Governor lacked authority to commute Ragland's sentence after *Miller* had been decided. We have never said that the Governor's article IV, section 16 power to grant commutations goes away when a sentence is subject to legal challenge based on a United States Supreme Court decision. Section 16 states the Governor "shall have power to grant reprieves, commutations and pardons, after conviction." If anything, this means that the Governor can commute a sentence at any time, so long as it is "after conviction."

When the Governor issued his order of commutation, Ragland's LWOP sentence was still in place. No judgment had set it aside. Ragland could not have taken a copy of *Miller*, showed it to the warden, and walked out of Anamosa State Penitentiary. *Miller* was not self-executing, and as the court observes, it was an open question whether *Miller* was retroactive and applied to cases like Ragland's or not. I happen to agree with the court that it was, but this is one matter that needed to be addressed before Ragland's LWOP sentence would be invalidated.

Also, I do not believe the Governor's reasons for granting commutation are subject to judicial scrutiny. From the perspective of the courts, it matters not whether the Governor's motivation was to preserve the legislature's previous sentencing scheme as much as possible, or to show leniency toward Ragland.

Section 16 makes this clear. It provides that the Governor "shall report to the general assembly . . . each case of reprieve, commutation, or pardon granted, and the reasons therefor." Iowa Const. art. IV, § 16. By expressly providing that the Governor would provide his reasons to the *legislature*, this tells me our framers intended that any check on the Governor's clemency authority would be in the *political* process. Article III, section 16 provides an analogue. It states that when the Governor vetoes legislation, he or she shall return it to the legislature "with his [or her] objections." Generally speaking, the objections are for political purposes, for the benefit of the legislature, not to enable judicial review. The same is true with the reasons for commutation that are also provided to the legislature under our constitution.

Furthermore, there is precedent for what the Governor did here. In 1972, the United States Supreme Court decided *Furman v. Georgia*, which invalidated the death penalty as imposed in a number of states. *See* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). Before certain death row inmates in Nevada, Texas, and Tennessee could receive a resentencing, however, their sentences were commuted to life in prison. *Bean v. Nevada*, 410 F. Supp. 963, 964 (D. Nev. 1974) (upholding the pardon board's commutation of the petitioner's sentence from death to LWOP after *Furman* struck down death-sentence statutes similar to Nevada's), *aff'd*, 535 F.2d 542 (9th Cir. 1976); *Collins v. State*, 550 S.W.2d 643, 646, 650 (Tenn. 1977) (upholding, on rehearing, the

governor's commutation of the petitioners' sentences from death to life imprisonment after the state supreme court held the death-sentence statute unconstitutional); *Stanley v. State*, 490 S.W.2d 828, 830 (Tex. Crim. App. 1972) (upholding the governor's commutation from death to life imprisonment of an inmate's sentence after his case was remanded by the U.S. Supreme Court along with *Furman*).  Life in prison was less severe than the death penalty but more severe than some other sentencing options that would have been available under a resentencing. *See Bean*, 410 F. Supp. at 964 (noting that the petitioner had originally been sentenced under a statute allowing for imprisonment "with or without the possibility of parole" (internal citation and quotation marks omitted)); *Collins v. State*, 550 S.W.2d 643, 646 (Tenn. 1977) (noting that a jury would resentence on remand "with punishment to be fixed in each case from twenty years to life imprisonment"); *Stanley*, 490 S.W.2d at 831–32 (Onion, J., dissenting) (noting that the defendant, in a new trial, would have been subject to a "full range of alternative penalties"). Presumably, in all three states, the purpose of the commutation was to come as close as constitutionally possible to the original sentence.  In addition, the defendants opposed the commutations.  *See, e.g., Bean*, 410 F. Supp. at 964; *Bowen v. State*, 488 S.W.2d 373, 377 (Tenn. 1972) ("[T]his commutation became effective without the consent of the defendant . . .").

Still, in all three states, the commutations were upheld.  *See Bean*, 410 F. Supp. at 965; *Mears v. Nevada*, 367 F. Supp. 84, 86 (D. Nev. 1973) (upholding the pardon board's commutation of the petitioner's sentence from death to LWOP after *Furman* struck down death-sentence statutes similar to Nevada's); *Collins*, 550 S.W.2d at 650; *Bowen*, 488 S.W.2d 373, 376 (Tenn. 1972) (recognizing the governor's ability to

commute the petitioner's sentence from death to ninety-nine years imprisonment in response to the *Furman* line of cases); *Stanley*, 490 S.W.2d at 830; *Whan v. State*, 485 S.W.2d 275, 277 (Tex. Crim. App. 1972) (upholding the Governor's commutation of the appellant's sentence from death to life imprisonment, which the governor issued while the case was pending in state court on remand from the United States Supreme Court); *see also Hartfield v. Quarterman*, 603 F. Supp. 2d 943, 950 (S.D. Tex. 2009) (stating that the governor may commute a defendant's sentence while the case is on remand, as long as "there [is] no final judgment by the Court of Criminal Appeals reversing [the] conviction."); *People ex rel. Madigan v. Snyder*, 804 N.E.2d 546, 558–60 (Ill. 2004) (upholding the Illinois governor's authority to commute a death sentence to life regardless of the pendency of a resentencing hearing); *People v. Brown*, 792 N.E.2d 788, 789–90 (Ill. 2002) (acknowledging the governor's ability to commute a sentence while the defendant's case awaited rehearing on appeal because the "defendant remained under an existing sentence").  To my knowledge, no court has held that a Governor lacks authority to commute an inmate's sentence where that specific sentence has not previously been vacated by a court.

Additionally, I do not see anything in the Governor's commutation order requiring a waiver of "constitutional, civil, fundamental, or human rights."  In any event, we said earlier this term: "[W]e have held the governor may impose conditions on the defendant in exchange for his clemency as long as the conditions themselves are not illegal, immoral, or impossible to be performed."  *Lowery v. State*, 822 N.W.2d 739, 741 (Iowa 2012) (stating also that "[i]n Iowa, the governor's constitutional clemency power may be exercised with broad discretion").  We then cited *Arthur v. Craig*, which long ago upheld the Governor's authority to issue

a conditional pardon that allowed the inmate to be summarily arrested and reincarcerated, without judicial review, if he violated any of the conditions. *See* 48 Iowa 264, 267–69 (1878).[8]

Nor am I aware of any legislation that would have limited the Governor's authority here. Iowa Code section 902.2 provides a procedure by which inmates serving life terms or the director of the department of corrections may *apply* for commutations, but does not appear to limit the Governor's authority to *grant* commutations. *See Makowski v. Governor*, 829 N.W.2d 291, 296 (Mich. Ct. App. 2012) (discussing a similar provision in Michigan and concluding that it "in no way limit[s] the Governor's absolute discretion with regard to commutation decisions"). Likewise, I read section 915.19, requiring the Governor to notify registered victims before he or she grants an application for commutation to an offender convicted of a violent crime, as potentially giving rights to victims, not the offender. *See* Iowa Code § 915.19(1) (2013). There is no indication that a victim had registered here. Also of note is section 914.1, which provides, "The power of the governor under the Constitution of the State of Iowa to grant a . . . commutation of sentence . . . shall not be impaired." *Id.* § 914.1.

One final note. Neither Ragland nor the State claims the district court's resentencing of Ragland to life with eligibility for parole after twenty-five years was improper *if* the sixty-years-without-parole sentence cannot stand. The district court imposed that sentence because it was the legislature's post-*Graham v. Florida*[9] fix for class "A" felonies

---

[8]*See also Lowery*, 822 N.W.2d at 742–43 (resolving the question of how a prisoner whose sentence had been commuted would accumulate earned time credit by interpreting the commutation order, rather than deciding the matter through statutory interpretation).

[9]560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

committed by juveniles other than first-degree murder. *See* 2011 Iowa Acts ch. 131, § 147 (codified at Iowa Code § 902.1(2)(*a*)). For now, I would simply emphasize that we are not approving, or disapproving, this life sentence with a twenty-five-year minimum in other cases affected by *Miller*. Because no one has challenged the district court's new sentence for Ragland, it should stand in this case without serving as a precedent elsewhere.

For the foregoing reasons, I join in the court's opinion but also write separately.

Waterman, J., joins this special concurrence.

**ZAGER, Justice (concurring specially).**

I join the majority opinion in affirming the resentencing ordered by the district court. However, I write separately because I disagree with the majority's conclusion that a commuted prison sentence of life without parole for sixty years is the functional equivalent or de facto life without parole (LWOP). I also disagree with the majority's holding that *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), and *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), apply to a term-of-years sentence, as I note in my dissent in *State v. Null*, 836 N.W.2d 41, 84–88 (Iowa 2013). Accordingly, I would affirm the district court for other reasons.

I agree with this court's remand for resentencing under a cruel and unusual punishment analysis due to Ragland's original sentence of LWOP for a homicide committed while he was a juvenile. *See State v. Ragland*, 812 N.W.2d 654, 659 (Iowa 2012). Under the circumstances and under *Graham* then *Miller*, the district court properly performed an individualized assessment of Ragland, taking into consideration the appropriate factors, including age and other circumstances surrounding the crime.

Prior to the evidentiary hearing, however, Governor Branstad issued his commutation of sentence to Ragland and numerous other juvenile offenders who were serving LWOP sentences. I agree that the Governor has the constitutional authority to commute sentences to life without parole for a term of years, as he did here. However, as noted by Justice Wiggins in his concurring opinion, the commutation power is not without limitation.

I believe the Governor exceeded his constitutional authority when he attempted to remove Ragland's ability to earn good time credit against this commuted sentence, as authorized by statute. *See* Iowa Code § 903A.2 (2013). Awarding earned good time credit would have allowed for the possibility of Ragland's release after forty-two and one-half years, which I would not consider to be the functional equivalent of LWOP. Under these circumstances, and for the reasons set forth in Justice Wiggins's concurring opinion, the district court was correct in refusing to give effect to the Governor's attempt to commute Ragland's sentence. The district court was correct in then applying *Miller* in this case, and I would affirm Ragland's sentence.