MANSFIELD, Justice (dissenting), I respectfully dissent. I would not find that the district court abused its discretion. As., a practical matter, the district court’s April 30, 2015 resentencing order required Mr. White to serve approximately two more years in prison before becoming eligible for parole. -This falls well within the district court’s “broad discretion” in these matters. See State v. Roby, 897 N.W.2d 127, 161 (Iowa 2017) (Zager, J., dissenting). As noted by the majority, White was convicted of three second-degree robberies. The 'most serious was the third, which White committed in February 2010 when he was less than two months short of his eighteenth birthday. White and, two companions waited as an immigrant who spoke little English cashed a $480 check at a convenience store. They then followed this man back to his apartment. While one companion held the man down, White punched and . kicked , the man in the face and demanded the money. Others in the apartment building apparently heard the commotion and came to the man’s assistance. White and the companions ran off but were apprehended. The man suffered visible abrasions on his forehead, nose, and leg as a result of White’s assault. White pled guilty to all three robberies under an agreement that the parties would recommend concurrent sentences. Second-degree robbery carries a ten-year sentence and, at that time, a requirement that the person serve seventy percent of the sentence before being eligible for parole. See Iowa Code § 711.3; id, §§ 902.9(4), .12(5) (2009). White received the jointly recommended eoncurreht sentences in July 2010. In September 2014, White filed for re-sentencing in light of State v. Lyle, 854 N.W.2d 378 (Iowa 2014). Before his resentencing took place, the district court ordered the department of corrections to provide a progress report. The report’ described White’s “lengthy history of disciplinary action” including “thirty-two major reports.” Notably, even as, the resentenc-ing proceeding was,..pending,. White incurred three additional major reports. By then, White was , almost twenty-three-years old. He was at offender privilege level 1 (on a 0 to 4 scale) and was not eligible for a job or any prison programming at that level. ■ , Reasonable people can debate the appropriateness of the sentence in this case. Personally, I am convinced that White would have committed more crimes if he had not been incarcerated in 2010, but I question the length of time he has been required to serve. This seems too severe to me. Yet I see no basis for. my views to displace those of the district court. That court clearly considered all the Miller/Ragland factors. Here are the factors: (1) the “chronological age” of the youth and the features of youth, including “immaturity, impetuosity, and failure to appreciate risks and consequences”; (2) the “family and home environment” that surrounded the youth; (3) “the circumstances of the ... ’ offense, including the éxtént of [the youth’s] participation in the conduct and the way familial and peer pressures may’ have affected [the youth]”; (4) the “incompétencies .associated with youth—for example, [the youth’s] inability to deal with police officers or prosecutors (including on a plea agreement) or [the youth’s] incapacity to assist [the youth’s] own attorneys”; and (5) “the possibility of rehabilitation.” State v. Ragland, 836 N.W.2d 107, 115 n.6 (Iowa 2013) (alterations in original) (quoting Miller v. Alabama, 567 U.S. 460, 477-78, 132 S.Ct. 2455, 2468, 183 L.Ed.2d 407 (2012)). And here are some relevant excerpts from what the court said at the resentencing: You had a very experienced public defender assisting you, although you were new to the criminal process in the sense óf, ,you know, being in adult court facing felony charges. So I appreciate that and I understand that. Your family and home environment is something that we learned a little bit about today from your mother with regard to your father. I think that’s something that the higher court wants the court, such as a judge such as myself, to consider, because it does have an impact when you see ... someone, in your case father figure, committing harmful acts, potential criminal acts, and the way youth react to that. We understand it’s not always positive and you’re getting leadership in the wrong way. So I do appreciate that. [[Image here]] ... [Tjhose three offenses, I think, need to be considered more seriously than the instance where there’s just the one. That ... plays directly into factor number three, but I think also it plays to factor number one.... I think the failure to appreciate risk and consequences go down as there are additional offenses. If you commit one and you do it again and then you do it again, I think as you repeated offenses, the appreciation of the risk and consequences becomes greater through the additional offenses. So we get down to five. Possibility of , rehabilitation, capacity for change. That’s something that’s really important for me.... Your record isn’t that good. And I appreciate what you say and particularly appreciate what your mother said.... But, you know, a lot of times action's speak louder than words. I would understand going to prison at 17 and having some problems adjusting, that I would understand. But your problems went on from 2010 through 2011 into 2012 to the point where you got into this program that sent you "over to Fort Madison. There you did pretty well. And if that 'had been sustained in total, maybe I would look at it a little differently, though it would be tougher. Then you got back to Anamosa and you had three major reports, including another assault. And the assault, you spoke to that, which I appreciate, but the assault is of concern. Today’s decision holds that what the district court did wasn’t good enough. The district court not ónly needed to apply the Miller/Ragland factors to Mr. White, something it clearly did, but it also needed to ground its application in juvenile brain science as filtered through expert testimony. Justice Zager has already thoroughly critiqued this fundamental redefinition of the Miller/Ragland factors. See Roby, 897 N.W.2d at 154-57, 161. I will not restate what he said in his Roby dissent. I will offer only two additional, hopefully new observations. First, the majority confuses the general and the specific. It is one thing to say that science indicates that the brains of juveniles, in general, are less developed than those of adults. This was what the United States Supreme Court concluded in Miller. In the Supreme Court’s view, this difference justified the elimination of a particularly harsh sentencing option for juveniles—mandatory life-without-parole. Miller, 567 U.S. at 470-71, 132 S.Ct. at 2464. However, it is quite another thing to say it is possible to scientifically calibrate the sentence of any particular juvenile offender. This seems to me a fool’s errand given what we know today. Criminal sentencing may be many things, but it isn’t science. To quote one observer who is sympathetic to the recent shift in juvenile sentencing law: ⅜ We can look at a brain scan of a broad cross-section of adolescents and compare that with a brain scan of a broad cross-section of adults and see significant differences that might well justify substantial legal distinctions. But we neither know, nor even could know, where a particular adolescent is on the developmental curve. Paul S. Davies & Peter A. Alces, Neuroscience Changes More than You Can Think, 2017 U. Ill. J.L. Tech. & Pol’y 141, 155 (2017). Reread the five Miller/Ragland factors I’ve quoted above. These aren’t matters of science. They are more accurately described as “tools for weighing juvenile culpability.” That is why no one, until this court in Roby, found that they needed to be presented to the sentencing court through expert testimony. I fear that requiring a “scientific” basis for any mandatory minimum sentence, regardless of the crimes committed or the length of sentence, is simply a backdoor way of eliminating mandatory mínimums. Second, the majority continues to focus only on procedure, not substance. Telling district courts they need to utilize science and expert testimony in making their findings isn’t helpful until you tell them what they need to find. In the context of life-without-parole sentences, the United States Supreme Court has been clear: no life-without-parole sentence unless the “crime[] reflects irreparable corruption.” Montgomery v. Louisiana, 577 U.S. -, -, 136 S.Ct. 718, 734, 193 L.Ed.2d 599 (2016) (quoting Miller, 567 U.S. at 479-80, 132 S.Ct. at 2469). Similar clarity regarding the Iowa standard would benefit our district judges. Our court has extended Miller to all mandatory mínimums but has yet to say what the substantive standard is. Plainly it isn’t “irreparable corruption”; we are talking in this case about a seven-year mandatory minimum. Still, our court hasn’t told district courts what that standard is. This isn’t about moving the goal posts. The court has yet to erect the goal posts. Again, I fear the court’s reluctance to provide some description of a constitutionally adequate mandatory minimum sentence for a juvenile means we are just on a way station toward eliminating all mandatory minimums for juveniles. For the foregoing reasons, and those set forth in Justice Zager’s Roby dissent, I would affirm the district court’s resentenc-ing order. Waterman and Zager, JJ., join this dissent.