Filed 2/28/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re CLYDE JAMES RAINEY,<br><br>　　　on Habeas Corpus. | A138921<br><br>(Contra Costa County<br>Super. Ct. No. 9807082) |

　　　Petitioner Clyde James Rainey (Rainey) seeks habeas relief under *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. 2455] (*Miller*), which holds mandatory life imprisonment without parole (LWOP) for those under the age of 18 at the time of their crimes violates the Eighth Amendment prohibition on cruel and unusual punishment. We conclude *Miller* applies retroactively to cases on collateral review and further conclude Rainey is entitled to habeas relief. We therefore grant the petition for writ of habeas corpus, vacate the sentence, and remand for resentencing in a manner consistent with the views expressed herein.

## BACKGROUND

　　　In 1999, a jury convicted Rainey of first degree murder, committed during an attempted robbery and with personal use of a firearm. The trial court sentenced him to LWOP under Penal Code section 190.5, subdivision (b).[1]

　　　The facts as stated in our unpublished opinion affirming the judgment of conviction are as follows: "On Halloween night, October 31, 1996, 20-year-old Koupou Saechao was twice shot in the back while in front of his aunt's apartment building in North Richmond. The aunt heard two gunshots, and then Saechao came to the door and

---

[1] All further statutory references are to the Penal Code.

1

collapsed in her arms.  Saechao said a 'black guy' shot him.  Saechao died four days later, on November 4.  [¶] The police arrested 16-year-old appellant on November 6, 1996.  Appellant is African American.  Appellant initially denied involvement in the shooting, then said that he and 14-year-old Donald C. tried to rob Saechao and Donald shot the victim when a patdown found nothing to steal.  Ultimately, after talking with his mother at the police station, appellant confessed that he was the one who shot Saechao.  When speaking to the police, appellant denied being a member of a gang, or participating in the shooting as a gang initiation.  [¶] Appellant's trial defense was that he was guilty of no more than manslaughter or second degree murder because he shot the victim as part of a gang initiation, not a robbery, and suffers from developmental limitations that impede his ability to premeditate."  (*People v. Rainey* (Feb. 7, 2001, A088153) [nonpub. opn.] at pp. 1–2.)

At the sentencing hearing, the prosecutor stated the People "would concede . . . that the driving force of this action did appear to be Donald [C.]; however, . . . Mr. Rainey is the man who pulled the trigger.  And I think it is extremely significant that he pulled the trigger twice.  And it was that act and that act alone that resulted in the death of the victim in this case."  Defense counsel, on the other hand, argued "the fact that there was somebody else as the driving force behind this crime . . . is significant in that . . . there wasn't a crime of tremendous planning, premeditation, not a whole lot of thought on Clyde Rainey's part; that he didn't walk out onto those streets with the evil intent of killing somebody that night . . . .  [¶] And his response is consistent with the problems that he had throughout his life that were almost never addressed, that he had remedial schooling, was placed in remedial schooling in the 2nd grade, . . . that he was failing out of school, that he was developing a drug and alcohol problem, that he had severe learning disabilities and intellectual impairment, nobody ever addressed those issues.  [¶] And it seems . . . justice would be fully done if this young man was able to earn the opportunity to ask the Parole Board [sometime in the future] . . . whether he's been rehabilitated or not."

The trial court observed Rainey had been under the jurisdiction of the juvenile court on "many, many occasions." And while Rainey may not have intended to "go on a mission of killing" that night, he knew "when he was given a gun" and "knew what he was doing and he knew the danger . . . involved."

On appeal, Rainey argued: (1) the trial court erred in failing to order a competency hearing; (2) his waiver of his right to remain silent was unknowing; (3) his confession was coerced; (4) evidence of the surreptitious monitoring of his police station conversation with his mother was wrongly admitted; (5) the court erred in instructing the jury to report juror misconduct; and (6) the court erred in instructing the jury on the principles of felony-murder when the doctrine was not specifically charged. (*People v. Rainey* (Feb. 7, 2001, A088153) [nonpub. opn.] at p. 6.) We rejected these claims, and affirmed the judgment. (*Ibid.*) The California Supreme Court denied Rainey's petition for review on May 16, 2001.

On June 13, 2013, Rainey filed the instant petition for writ of habeas corpus. We issued an order to show cause and granted his motion for appointment of counsel nunc pro tunc.[2] The Attorney General filed a written return, and Rainey thereafter filed a traverse. The parties declined to request oral argument.

## DISCUSSION

### A. *Eighth Amendment in Juvenile Context*

In *Roper v. Simmons* (2005) 543 U.S. 551, 574–575 [161 L.Ed.2d 1, 125 S.Ct. 1183] (*Roper*), the Unites States Supreme Court held imposing the death penalty on juvenile offenders older than 15 years of age but younger than 18 years, is cruel and unusual punishment precluded by the Eighth Amendment. In *Graham v. Florida* (2010)

---

[2] Although a court of review "may refuse to issue a writ of habeas corpus when it appears that the application should have been first made in the lower court," we have decided to entertain this matter in the first instance because the petition raises important legal issues concerning the constitutionality of juvenile sentencing procedures. (See *In re Moss* (1985) 175 Cal.App.3d 913, 922 [221 Cal.Rptr. 645] ["intervention is proper by this court in the first instance because the issues raised involve fundamental due process rights [and] . . . it affords us the opportunity to provide guidance to the trial court"].)

560 U.S. 48, ___ [176 L.Ed.2d 825, 845, 130 S.Ct. 2011, 2030] (*Graham*), the high court extended the constitutional limitations on juvenile punishment, holding the Eighth Amendment "forbids the sentence of life without parole" for a juvenile offender who does not commit homicide.

Most recently, in *Miller*, the Supreme Court held any sentencing scheme that "mandates life in prison without possibility of parole for juvenile offenders" is also forbidden under the Eighth Amendment. (*Miller, supra,* 132 S.Ct. at p. 2469.) The court reasoned: "*Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id.* at p. 2468.)

The court added, "[G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty *will be uncommon*. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's

4

ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra,* at p. 2469, italics added.)

Under California law, "[t]he penalty for a defendant found guilty of murder in the first degree, in any case with one or more special circumstances . . . found to be true . . . , who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for [LWOP] or, at the discretion of the court, 25 years to life." (§ 190.5, subd. (b).) Courts have interpreted section 190.5, subdivision (b) to mean LWOP is the statutorily identified *presumptive* punishment for a 16- or 17-year-old special circumstance murderer, unless the sentencing court, in the exercise of its discretion, finds good reason to impose the less severe sentence of 25 years to life. (*People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1089 [83 Cal.Rptr.3d 340]; *People v. Guinn* (1994) 28 Cal.App.4th 1130, 1141–1142 [33 Cal.Rptr.2d 791].)

Recently, California appellate courts have addressed direct appeals by juvenile offenders contending their LWOP sentences under section 190.5, subdivision (b), are unconstitutional under *Miller*, and have reached differing dispositions. Some courts have affirmed the LWOP judgment, reasoning the record showed the trial court did not presumptively impose LWOP, but rather exercised informed discretion in imposing that sentence. (See, e.g., *People v. Gutierrez* (2012) 209 Cal.App.4th 646, 659 [147 Cal.Rptr.3d 249, 260] [noting § 190.5 "does not require a mandatory LWOP sentence and vests sentencing courts with the discretion to sentence the defendant to a term of 25 years to life with the possibility of parole"], review granted Jan. 3, 2013, S206365.[3]) Other

---

[3] We do not cite *Gutierrez* and other juvenile LWOP cases in which review has been granted for precedential purposes, but only to illustrate the differing approaches taken by the courts of appeal in reviewing *Miller* claims. In granting review in *Gutierrez,* the California Supreme Court identified the issue to be briefed and argued as: "Does the sentence of life without parole imposed on this juvenile offender under Penal Code section 190.5, subdivision (b), violate the Eighth Amendment under *Miller v. Alabama*

5

courts have vacated the LWOP sentence and remanded for resentencing, reasoning that in applying the judicially recognized presumption that LWOP is the appropriate term for a 16- or 17-year-old defendant, the sentencing court failed to exercise its discretion in the manner required by *Miller*. (See, e.g., *People v. Moffett* (2012) 209 Cal.App.4th 1465, 1476 [148 Cal.Rptr.3d 47, 55], review granted Jan. 3, 2013, S206771; *People v. Siackasorn* (2012) 211 Cal.App.4th 909, 915–916 [149 Cal.Rptr.3d 918, 923], review granted Mar. 20, 2013, S207973.)

### B.     Miller *Applies Retroactively to Cases on Collateral Review*

Rainey seeks the benefit of *Miller* by way of habeas relief.  We therefore first address whether *Miller* applies retroactively to cases on collateral review.

Retroactivity is assessed under the test enunciated in *Teague v. Lane* (1989) 489 U.S. 288 [103 L.Ed.2d 334, 109 S.Ct. 1060] (*Teague*).  (See *In re Gomez* (2009) 45 Cal.4th 650, 653 [88 Cal.Rptr.3d 177, 199 P.3d 574] (*Gomez*) [applying *Teague* and concluding *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] applied on collateral review to judgments final before it was decided but after *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] was decided].)[4]

In *Teague*, the Supreme Court held that in general " 'new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.'  [Citation.]" (*Lambrix v. Singletary* (1997) 520 U.S. 518, 527 [137 L.Ed2d 771, 117 S.Ct. 1517].)  "A holding constitutes a 'new rule' within the meaning of *Teague* if it 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not '*dictated* by precedent existing at the time the

_____

(2012) ___U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407]?"  (*People v. Gutierrez* (Jan. 3, 2013, S206365) 150 Cal.Rptr.3d 567.)

[4] The California Supreme Court also stated in *Gomez* "we are 'free to give *greater retroactive impact* to a decision than the federal courts choose to give[,]' " but added "[b]ecause we conclude . . . *Teague* requires the application of *Cunningham* in the present case, we need not consider the result we would reach under state retroactivity principles." (*Gomez, supra,* 45 Cal.4th at p. 655, fn. 3, italics added.)

6

defendant's conviction became final.'  *Teague, supra,* [489 U.S.] at 301 (emphasis in original)."  (*Graham v. Collins* (1993) 506 U.S. 461, 467 [122 L.Ed.2d 260, 113 S.Ct. 892].)

*Teague* recognized two exceptions to the "new rule" principle:  " 'The first exception permits the retroactive application of a new rule if the rule places a class of private conduct beyond the power of the State to proscribe [citation], or addresses a "substantive categorical guarante[e] accorded by the Constitution," such as a rule "prohibiting a certain category of punishment for a class of defendants because of their status or offense." ' [Citations.]"  (*Graham v. Collins, supra,* 506 U.S. at p. 477.)  More recently, the high court has clarified that new rules falling within the first *Teague* exception "are more accurately characterized as substantive rules not subject to [*Teague*'s] bar."  (*Schriro v. Summerlin* (2004) 542 U.S. 348, 352, fn. 4 [159 L.Ed.2d 442, 124 S.Ct. 2519] (*Schriro*); *Beard v. Banks* (2004) 542 U.S. 406, 411, fn. 3 [159 L.Ed.2d 494, 124 S.Ct. 2504] [same].)  In *Schriro,* the court explained new substantive rules "apply retroactively because they 'necessarily carry a significant risk that a defendant stands convicted of "an act that the law does not make criminal" ' or faces a punishment that the law cannot impose upon him."  (*Schriro, supra,* 542 U.S. at p. 352.)

The second exception to *Teague*'s bar on retroactivity is for " ' "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." ' [Citations.]"  (*Beard v. Banks*, *supra*, 542 U.S. at p. 417.)  The second *Teague* exception is limited in scope and applies " ' "only to a small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty." ' [Citations.]"  (*Ibid.* [observing "we have yet to find a new rule that falls under the second *Teague* exception"].)

*Teague* also made clear that if one petitioner gets the benefit of a new rule, then the rule should apply retroactively "to others similarly situated," as any other approach would be "inequitable."  (*Teague, supra,* 489 U.S. at p. 315.)  "[T]he harm caused by the failure to treat similarly situated defendants alike cannot be exaggerated:  such

7

inequitable treatment 'hardly comports with the ideal of "administration of justice with an even hand." ' [Citations.]" (*Ibid.*) Thus, the court stated it would "simply refuse to announce a new rule in a given case unless the rule would be applied retroactively to the defendant in the case and to *all* others similarly situated." (*Id.* at p. 316 ["implicit in the retroactivity approach we adopt today, is the principle that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to all defendants on collateral review through one of the two exceptions we have articulated"].)

In view of *Teague*'s statement to the effect equal justice requires that when a new substantive rule is applied to a habeas petitioner in a case announcing the new rule, the rule must "be applied retroactively to all who are similarly situated" (*Teague, supra,* 489 U.S. at p. 300), the procedural posture of *Miller*, itself, supports its retroactive application. As the Supreme Court of Iowa observed in *State v. Ragland* (Iowa 2013) 836 N.W.2d 107 (*Ragland*), "*Miller* involved the companion case of *Jackson v. Hobbs*. See *Miller*, 567 U.S. at __, 132 S.Ct. at pp. 2461–2462 . . . . *Miller* was a direct appeal, but *Jackson* involved a petition for habeas corpus brought after the conviction had been affirmed on direct appeal. *See id* . . . . Nevertheless, the Supreme Court specifically held the new rule applied not only to the defendant in *Miller*, but also to the defendant in *Jackson* on collateral review. *See id.* at __, 132 S.Ct. at 2475, 183 L.Ed.2d at 430. The Court directed that the defendant in *Jackson* be given an individualized hearing. *See id.* There would have been no reason for the Court to direct such an outcome if it did not view the *Miller* rule as applying retroactively to cases on collateral review. We also recognize that the dissent in *Miller* suggested the majority's decision would invalidate other cases across the nation. *See id.* at __, 132 S.Ct. at 2479–80, 183 L.Ed.2d at 433 (Roberts, C.J., dissenting). Again, the dissent would not have raised this concern if the Court did not believe its holding applied to cases on collateral review." (*Ragland, supra,* 836 N.W.2d at p. 116.)

We agree with this analysis—that the United States Supreme Court's application of the rule announced in *Miller* to the habeas petitioner in the companion case

8

demonstrates the high court announced a new "substantive" rule of law and intended the rule to apply "retroactively to all who are similarly situated." (*Teague, supra,* 489 U.S. at p. 300.)

This conclusion is bolstered by the fact decisions in both lines of cases *Miller* relied on in announcing the bar on mandatory LWOP sentences for juveniles have been applied with retroactive effect. (See, e.g., *In re Sparks* (5th Cir. 2011) 657 F.3d 258, 262 [noting "the Supreme Court's decision in *Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335, 122 S.Ct. 2242],] barring the execution of the mentally retarded has been given retroactive effect, [citation], as has the Court's decision in *Roper* . . . , barring the execution of juvenile offenders"]; see also *Songer v. Wainwright* (1985) 769 F.2d 1488, 1489 [noting that *Lockett v. Ohio* (1978) 438 U.S. 586, 604–605 [57 L.Ed.2d 973, 98 S.Ct. 2954], fn. omitted ("[T]he Eight and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death") has been given retroactive effect].) The Iowa Supreme Court made the same point in holding *Miller* applied retroactively, stating the "practical observation of the treatment of the underlying authority of *Miller* is instructive. If a substantial portion of the authority used in *Miller* has been applied retroactively, *Miller* should logically receive the same treatment." (*Ragland, supra,* 836 N.W.2d at p. 116.)

Furthermore, *Miller* held the Eighth Amendment prohibits the imposition of an LWOP sentence upon a juvenile offender unless the sentencing court considers the offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences," as well as the offender's "family and home environment" and "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." (*Miller, supra,* 132 S.Ct. at p. 2468.) Thus, the *Miller* rule constitutes a new substantive rule, and is not subject to *Teague*'s retroactivity bar, because it prohibits "a certain category of punishment [LWOP] for a class of defendants

9

[juvenile offenders convicted of homicide] because of their status [chronological age and its hallmark features] or offense." (*Penry v. Lynaugh* (1989) 492 U.S. 302, 330 [106 L.Ed.2d 256, 109 S.Ct. 2934], abrogated on other grounds by *Atkins v. Virginia, supra*, 536 U.S. 304.) In short, the *Miller* rule—prohibiting the imposition of an LWOP sentence on a juvenile offender absent a consideration of the juvenile "chronological age and its hallmark features" (*Miller, supra,* 132 S.Ct. at pp. 2468–2469)—applies retroactively because it " 'necessarily carr[ies] a significant risk that a defendant . . . faces a punishment that the law cannot impose upon him.' " (*Schriro, supra,* 542 U.S. at p. 352.)

We therefore conclude *Miller* announced a new substantive rule that applies retroactively to cases on collateral review.

## C.      Merits

Turning to the merits of Rainey's claim, he contends he is entitled to habeas relief under *Miller* on two separate grounds. First, he asserts California's presumption of LWOP for any special circumstance murder committed by a juvenile violates the command of *Miller* that such sentences must be the exception rather than the norm. Second, he maintains his sentence must be vacated because the trial court did not adequately consider the distinctive mitigating circumstances of his youth and background, as required by *Miller*.

As to the first asserted ground for relief, a review of the sentencing documents included in the appendix to the habeas petition does not support the conclusion the trial court imposed the LWOP sentence in a presumptive manner.[5] Rather, the record indicates the sentencing court understood it could choose to impose the lesser punishment of 25 years to life.

---

[5]  These documents include a transcript of the sentencing hearing, a defense sentencing memorandum, the probation report and a neuropsychological evaluation finding Rainey had a "Full Scale I.Q. of 75, placing him in the borderline range of overall intellectual ability," and concluding that testing indicated Rainey "exhibits significant neuropsychological impairment."

10

Nevertheless, we conclude Rainey is entitled to habeas relief on the second ground asserted. The record demonstrates the sentencing judge imposed LWOP on the basis of several factors, including Rainey's lengthy juvenile court record, the jury's special circumstance finding that he committed murder during a robbery, the jury's finding Rainey personally used a firearm during the commission of the crime, and the court's determination he "knew what he was doing and . . . knew the danger in which he was involved." Missing from the court's sentencing discourse is a full consideration of the factors, now constitutionally mandated under *Miller*, related to "the distinctive attributes of youth [that] diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." (*Miller, supra,* 132 S. Ct at p. 2465.) Because *Miller* requires sentencing courts to consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" (*id.* at p. 2469), and the trial court here did not consider the "hallmark features" of youth now mandated under *Miller* (*id.* at p. 2468), we conclude habeas relief must be granted.

We reject the Attorney General's contention that habeas relief should be denied because Rainey "now has the possibility of parole" under section 1170, subdivision (d)(2). This subdivision, enacted in 2012, provides a "recall" procedure for a juvenile LWOP sentence, after a period of 15 years. (§ 1170, subd. (d)(2)(A)(i) ["When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has served at least 15 years of that sentence, the defendant may submit to the sentencing court a petition for recall and resentencing."].)[6]

The legislative history reflects section 1170, subdivision (d)(2), was enacted in response to *Roper* and *Graham*. (Assem. Comm. on Public Safety, Analysis of Sen. Bill No. 9 (2011–2012 Reg. Sess.) as amended May 27, 2011.) This legislation pre-dated by

---

[6] If a sentence is not recalled, the defendant may submit another petition after serving 20 years, and if unsuccessful then may submit one additional petition after serving 24 years. (§ 1170, subd. (d)(2)(H).)

11

three months the Supreme Court's decision in *Miller*, but *Roper* and *Graham,* as we have discussed, were the analytical foundation for *Miller* and established the fundamental principle that the inherent attributes of youth must be considered before a State imposes the harshest of criminal penalties. Accordingly, it appears the Legislature believed this legislation rectified constitutional shortcomings that might otherwise be attendant to juvenile LWOP sentences under section 190.5, subdivision (b).

However, section 1170, subdivision (d)(2), is not fully congruent with *Miller.* To begin with, we believe *Miller* makes clear the special considerations attendant to youth are to be considered at the time of sentencing. (E.g., *Miller, supra,* 132 S. Ct. at p. 2466 [mandatory penalty schemes "prevent the sentencer from taking account of these central considerations"]; *id.* at p. 2476 (conc. opn. of Breyer, J.) [Court has "insisted" that "a sentencer have the ability to consider the 'mitigating qualities' of youth"]; *id.* at pp. 2468 ["*Graham* and *Roper* and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult"], 2469 [ "sentencer needed to examine all these circumstances before concluding that life without any possibility of parole was the appropriate penalty"].) Indeed, the Supreme Court pointed out that, "given all we have said in *Roper* and *Graham,* and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty [LWOP] will be uncommon." (*Id.* at p. 2469.)

We cannot square Section 1170, subdivision (d)(2)'s petitioning process—at the soonest 15 years after sentencing—with the import of the Supreme Court's discussion and analysis in *Miller*. The statute effectively makes *Miller's* mandate irrelevant to our sentencing courts, under the rubric that constitutionally mandated youth sentencing factors can be deferred at a minimum for a decade and a half. We do not believe the high court had in mind any such deferral of constitutionally required sentencing considerations, particularly since the court envisions that such consideration will result in the harshest of sentences being "uncommon."

Furthermore, there is no guarantee that a petition seeking recall and resentencing under section 1170, subdivision (d)(2), will be heard on the merits. Rather, a hearing is conditioned on the defendant "describing his or her remorse and work towards rehabilitation" and stating that one of the following four circumstances is true: (1) he or she "was convicted pursuant to felony murder or aiding and abetting murder provisions"; (2) he or she does not have other prior juvenile felony adjudications "for assault or other felony crimes with a significant potential for personal harm to victims"; (3) he or she "committed the offense with at least one adult codefendant"; or (4) he or she "has performed acts that tend to indicate rehabilitation or potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse." (§ 1170, subd. (d)(2)(B)(i)–(iv).) Nothing in *Miller* remotely suggests that a juvenile must make a threshold showing of some sort before a sentencing court is constitutionally required to consider the implications of his or her youth.

Additionally, even when a section 1170, subdivision (d) petition is heard on the merits, the enumerated factors the court may consider in deciding whether to resentence the defendant do not embrace the totality of the considerations the Supreme Court discussed in *Miller*, *Roper* and *Graham*. In addition to the factors, except rehabilitation efforts, just mentioned (§ 1170, subd. (d)(2)(F)(i)–(iii)), a court ruling on the merits of a recall petition may consider: whether, prior to the crime, the defendant "had insufficient adult support or supervision and had suffered from psychological or physical trauma, or significant stress" (*id.*, subd. (d)(2)(F)(iv)); whether the defendant "suffers from cognitive limitations due to mental illness, developmental disabilities, or other factors that did not constitute a defense, but influenced the defendant's involvement in the offense" (*id.*, subd. (d)(2)(v)); whether the defendant "has maintained family ties or connections with others through letter writing, calls, or visits, or has eliminated contact with individuals outside of prison who are currently involved in crime" (*id.*, subd. (d)(2)(F)(vii)); and whether the defendant "has had no disciplinary actions for violent activities in the last

13

five years in which the defendant was determined to be the aggressor" (*id.*, subd. (d)(2)(F)(viii).

These factors describe what might be called causative agents of criminal conduct, i.e., lack of parental supervision or positive adult role models, and mental or physical impairment. Missing from this list is the fundamental fact of youth, and its attendant attributes, on which the Supreme Court has focused—"*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing."[7] (*Miller, supra,* 132 S. Ct. at p. 2464.) Youth, the court has said, " 'is more than a chronological fact.' " (*Id.* at p. 2467, quoting *Eddings v. Oklahoma* (1982) 455 U.S. 104, 115 [71 L.Ed.2d. 1, 102 S. Ct. 869].) "It is a time of immaturity, irresponsibility, " 'impetuousness[,] and recklessness.' " (*Miller*, at p. 2467, quoting *Johnson v. Texas* (1993) 509 U.S. 350, 368 [125 L.Ed.2d 290, 113 S. Ct. 2658].) Thus, "a sentencer misses too much if he treats every child as an adult." (*Miller*, at p. 2468.) While section 1170, subdivision (d)(2)(I), provides that a court hearing a recall petition "may" also "consider any other criteria that the court deems relevant to its decision, " this proviso neither identifies, nor requires the court to consider, the inherent "mitigating qualities of youth"

---

[7] "Those cases relied on three significant gaps between juveniles and adults. First, children have a ' "lack of maturity and an undeveloped sense of responsibility," ' leading to recklessness, impulsivity, and heedless risk taking. *Roper,* 543 U.S., at 569 . . . . Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid.* And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] depravi[ity].' *Id.,* at 570 . . . ." (*Miller, supra*, 132 S.Ct. at p. 2464.) The *Miller* court further stated that in *Graham,* the court elaborated "that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' 560 at U.S., at ___, 130 S.Ct., 2011 . . . . We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessen a child's 'moral culpability' and enhanced the prospect that, as years go by and neurological development occurs, his ' "deficiencies will be reformed." ' [Citations.]" (*Miller, supra,* at pp. 2464–2465, fn. omitted.)

14

which the Supreme Court has instructed must be considered before imposing a State's harshest penalties. (*Miller,* at p. 2467.)

Our conclusion that section 1170, subdivision (d)(2), does not foreclose Rainey from obtaining habeas relief is also consistent with the reasoning in *In re Heard* (2014) 223 Cal.App.4th 115 [166 Cal.Rptr.3d 824] (*Heard*). In *Heard*, the Court of Appeal concluded section 3051, subdivision (a)(1), enacted in 2013 in response to *Miller* and *Graham* and allowing for earlier "youth offender parole hearing[s]," does not avoid the necessity of a remand for resentencing to consider the factors constitutionally mandated by *Miller*. (*Heard, supra,* 223 Cal.App.4th at pp. 127–131.) While the new statute offers most juvenile offenders (but not Rainey[8]) a "meaningful opportunity to obtain parole during their lifetimes" (*Heard*, at p. 130), it effectively transfers to the parole authority, well after the fact, the constitutional obligation *Miller* imposes on sentencers to consider the attributes of youth in determining whether to impose the state's harshest penalties. The appellate court refused to adopt a construction of section 3051, subdivision (a)(1), that "relieves the sentencing court[s]" of their "constitutional duty to consider the differences between juveniles and adults when sentencing juvenile offenders."[9] (*Heard, supra,* 223 Cal.App.4th at pp. 130–131.) We have concluded the same as to section 1170, subdivision (d)(2).

---

[8] Because he was sentenced to LWOP, Rainey is among the few defendants to which the section 3051, subdivision (a)(1), does not apply. (§ 3051, subd. (h).)

[9] *Heard, supra*, 223 Cal.App.4th at pages 129–130 and footnote 9 acknowledged its conclusion is contrary to that in *In re Alatriste* (2013) 220 Cal.App.4th 1232, 1238–1239 [163 Cal.Rptr.3d 748], and *People v. Martin* (2013) 222 Cal.App.4th 98, 103–105 [165 Cal.Rptr.3d 605], both of which concluded section 3051's juvenile parole provisions avoided constitutional deficiencies with sentences arguably the functional equivalent of LWOP. *Heard* disagreed, as do we, with the view expressed in those cases that "*Graham* [and] *Miller* . . . only hold that a juvenile may not be incarcerated for life or its functional equivalent without some meaningful opportunity for release on parole during his or her lifetime" and do not impose any obligation in that regard on a sentencing court. (*Heard, supra,* 223 Cal.app.4th at pp. 129–130 & fn. 9.)

**DISPOSITION**

The petition for habeas corpus is granted.  Petitioner's LWOP sentence is vacated and the matter is remanded for resentencing.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero. J,

A138921, *In re Rainey*

Trial Judge:                          Honorable Richard E. Arnason
Trial Court:                          Contra Costa County Superior Court

L. Richard Braucher for Petitioner.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Laurence K. Sullivan and René A. Chacón, Supervising Deputy Attorneys General for Respondent.