ZAGER, Justice
(dissenting).
The court giveth and the court taketh away. In part III.A-B of its opinion, the court correctly concludes that the Iowa Constitution does not categorically prohibit a district judge, after a hearing on all relevant factors, from sentencing a juvenile who commits a serious felony such as rape, armed robbery, or murder, to a minimum period of incarceration before the juvenile is eligible for parole. However, this correct but limited conclusion in III.A-B is subsequently undermined by other aspects of the opinion.
The court introduces a number of statements that go beyond what this court has *151 decided in its prior juvenile sentencing opinions. For example, the court declares that minimum periods of incarceration need to be “short” and “uncommon.” These statements can, and I expect will, be seized upon in future cases to strike down any minimum term of incarceration.
More directly, in part III.C-D, the court restates the relevant factors in a way that will make it difficult, if not practically impossible, for a sentencing judge to ever impose any minimum term of incarceration. These significant, practical implications are another impediment to our district court judges who expend substantial time and energy exercising their discretion in sentencing. Every application of every factor must weigh in favor of the defendant. I have repeatedly cautioned that this approach, in effect, removes any sentencing discretion from the district court and “bestows upon our appellate courts the freedom to impose their members’ judgments about the appropriateness of a sentence.” State v. Lyle, 854 N.W.2d 378, 412 (Iowa 2014) (Zager, J., dissenting).
Moreover, it is now apparent that expert testimony will be required on both sides before a juvenile can be sentenced to any minimum period of incarceration. The court’s opinion thus endorses and perpetuates the cottage industry that has developed for mitigation experts—a burden not only for the district court judges and the State, but also for the juvenile defendants themselves, many of whom are represented by a public defender or who may otherwise be constrained by costs. In short, while the court has technically not invalidated all minimum terms of incarceration for juveniles, today’s opinion will have that effect in the real world in which our district courts must operate. And the question that must be asked is: will the sentence of the district court be any more valid or constitutional? I don’t believe so.
The majority opinion takes our state even farther away from the national'consensus, but it provides no adequate justification for this continued extension in juvenile sentencing. The restatement of the relevant factors does not make sense, and the court’s continued push to shift authority from our district court judges to the parole board will not achieve the outcomes it would like to see.
I. Today’s Extensions of Lyle Move Us Farther Away from Other Jurisdictions.
Today’s decision pulls Iowa farther away from the rest of the nation. In 2014, this court declared unconstitutional any sentencing law requiring individuals under the age of eighteen who committed felonies to be incarcerated for any mandatory minimum period of time. See Lyle, 854 N.W.2d at 400 (majority opinion). This rule applied no matter how heinous the crime, such as first-degree murder, or how short the period of incarceration, such as one year. See id. All such sentences were deemed cruel and unusual. To its credit, the majority acknowledged in Lyle the uniqueness of its decision. “[W]e recognize no other court in the nation has held that its constitution or the Federal Constitution prohibits a statutory schema, that prescribes a mandatory minimum sentence for a juvenile offender.” Id. at 386.
Three years have passed since Lyle was decided. Not surprisingly, criminal defense lawyers in other jurisdictions have urged their states to follow Lyle. None have accepted the invitation. See, e.g., State v. Imel, No. 2 CA-CR 2015-0112, 2015 WL 7373800, at *3 (Ariz. Ct. App. Nov. 20, 2015) (“[W]e disagree with Lyle’s characterization of the Court’s holding in Miller [v. Alabama, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) ].”); People v. Rigmaden, No. C071533, 2015 WL 5122916, at *152 *18 (Cal. Ct. App. Sept. 1, 2015) (declining to follow Lyle while observing that “policy arguments about sentencing juveniles in light of current research on the developing brains of adolescents (neuroscience)” are “more properly directed to the Legislature”); People v. Applewhite, 409 Ill.Dec. 849, 68 N.E.3d 957, 964 (Ill. App. Ct. 2016) (“[W]e are not persuaded by the defendant’s reliance on an Iowa Supreme Court case finding that all mandatory minimum juvenile sentences are unconstitutional.”); State v. Anderson, No. 26525, 2016 WL 197122, at *11 (Ohio Ct. App. Jan. 15, 2016) (“The only authority Anderson cites directly supporting the proposition that all mandatory minimum sentences imposed on juveniles tried in adult court constitute cruel and unusual punishment is [Lyle].... Upon review, we decline to adopt the majority approach in Lyle,”); State v. Barbeau, 370 Wis.2d 736, 883 N.W.2d 520, 533-34 (Wis. Ct. App. 2016) (declining to follow Lyle).
In fairness, it should be noted the Washington Supreme Court recently held that under the Eighth Amendment, a trial court sentencing juveniles in the adult criminal justice system “must be vested with full discretion to depart from the sentencing guidelines and any otherwise mandatory sentence enhancements, and to take the particular circumstances surrounding a defendant’s youth into account.” State v. Houston-Sconiers, 188 Wash.2d 1, 391 P.3d 409, 426 (2017). . Yet, the Washington court did not rely on its state constitution, did not mention Lyle, and did not hold that the trial court has an affirmative obligation to hold a hearing covering all the Miller factors in every case (as opposed, to simply receiving and considering such evidence when it was offered). Id. at 419-20 Also, the Washington court confirmed that the trial court sentencing juveniles in the adult criminal justice system must be vested with “full discretion” to depart from prescribed sentences. Id. at 421 I have not seen such a confirmation of discretion in our sentencing judges in any of our juvenile sentencing opinions. While the Washington Supreme Court may have reached a “similar conclusion,” it did not cite to our opinion.
In light of Lyle’s negative reception in other states, I think a more cautious approach is appropriate. Instead, today’s opinion extends Lyle. Consider the following examples. In Lyle, we said “juveniles can still be sentenced to long terms of imprisonment, but not mandatorily.” 854 N.W.2d at 401 (emphasis added). Just one year ago, in State v. Sweet, this court assured everyone that even doing away with the option of life without parole was only a “marginal” change because juveniles who committed murder would still serve “a substantial period of incarceration.” 879 N.W.2d 811, 835 (Iowa 2016) (emphasis added). The majority now takes the opposite approach, walking away from its previously stated position. The majority says instead that “it may be appropriate retribution to incarcerate a juvenile for a short time without the possibility of parole” and “a sentencing judge could properly conclude a short term of guaranteed incarceration is necessary to protect the public.” So “long” and “substantial” have now been replaced by “short.” If we keep changing the standards, how can we expect our district court judges to reliably apply any sentencing factors?
In Lyle, we said that “[s]ome juveniles will deserve mandatory minimum imprisonment, but others may not.” 854 N.W.2d at 403. We added,
[Trial] judges will do what they have taken an oath to do. -They will apply the law fairly and impartially, without fear. They will sentence those juvenile offend *153 ers to the maximum sentence if warranted and to a lesser sentence providing for parole, if warranted.
Id. at 404. But today we announce that “[a] sentence of incarceration without parole will he an uncommon result.” In other words, the district court’s discretion to do what is warranted by the facts in front of it must give way to a mandate that, except in rare and yet undefined circumstances, the juvenile must be immediately parole eligible. In reality, the majority’s opinion makes the district court’s sentencing discretion merely illusory.
In Lyle, we distinguished between “inane juvenile schoolyard conduct” and “cold and calculated adult conduct,” recognizing that some juvenile conduct was subject to deterrence. Id. at 401. Today, though, the majority concludes that “the justification of deterrence will normally be irrelevant to all juveniles.” I strongly disagree. Both this court and the Supreme Court have continuously acknowledged that, while deterrence has less weight in the analysis of the penological justifications for juvenile sentencing due to the impetuosity of juvenile decision making, it still has some weight in' every case. Roper v. Simmons, 543 U.S. 551, 570, 125 S.Ct. 1183, 1196, 161 L.Ed.2d 1 (2005) (“[T]he same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence.”); Lyle, 854 N.W.2d at 399 (“We add that a deterrence rationale is actually even less applicable when the crime ... is lesser.”); State v. Null, 836 N.W.2d 41, 63 (2013) (“The [Supreme] Court concluded deterrence has less validity because of the ‘impetuous and ill-considered’ nature of juvenile decision making.” (quoting Graham v. Florida, 560 U.S. 48, 72, 130 S.Ct. 2011, 2028-29, 176 L.Ed.2d 825 (2010))).
Now, we have again changed the standards and concluded that instead of simply having less weight in our analysis, deterrence is now “normally irrelevant to all juveniles;” In practice, what does this mean? How is “less weight” different from “normally irrelevant,” and how are our district court judges supposed to realistically apply this penological goal when the goalposts have shifted yet again?,I think the court’s observation on the irrelevance of deterrence would surprise most parents who believe that deterrence can be effective with their children. Indeed, there is a sense in which this court’s ever-expanding juvenile jurisprudence demeans the great majority of youth who do not commit serious felonies.
This approach also moves us away from the" Model Penal Code: Sentencing approach to juvenile sentencing. While the Model Penal Code gives priority to rehabilitation and reintegration into society, it does not foreclose the use of the penological goal of deterrence. Model Penal Code: Sentencing § 6.11A(b), at 215 (Am. Law Inst., Proposed Final Draft 2017); id. cmt. (c)(5), at 220-21. Thus, the Model Penal Code would allow for “the judge’s ability to find, when supported by the facts, that an offender under 18 acted with an unusually high degree of personal blameworthiness.” Id. at 218. It adds that courts “must also attend to the ‘gravity of offenses’ and the ‘harms done to crime victims’ when reaching final judgments of proportionality. The seriousness of the victim injuries does not diminish when their assailants were underage.” Id. Notably, the Model Penal Code is, as its name states, a model for adoption by legislatures, not a constitutional minimum. Yet even with this model, the consensus of the American Law Institute is that other considerations besides rehabilitation may enter into juvenile sentencing.
II. There Is No Jurisprudential Basis for the Majority’s Extensions of Lyle.
. These extensions of Lyle find no support in the text of article I section 17, which *154 only prohibits “cruel and unusual punishment[s].” Iowa Const, art. I, § 17. Ordering a sixteen- or seventeen-year-old who commits a rape, an armed robbery, or a murder to serve some amount of time before being eligible for parole is neither cruel nor unusual.
Nor do the majority’s statements find support in established jurisprudence. For example, Miller indicated that the “harshest possible penalty,” i.e., life without parole, should be “uncommon” for juvenile homicide offenders. 567 U.S. at 479, 132 S.Ct. at 2469 (“[W]e think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.” (Emphasis added.)). Today, as noted above, the court says that minimum prison terms of any length for juveniles should be uncommon. This twists words to give the impression that the court is simply following in the tracks of Miller when in reality, it is not.
To give another example, Miller said that juveniles are “less likely to consider potential punishment” before committing crimes. Id. at 472, 132 S.Ct. at 2465. As a general statement, that is probably true. But the majority takes Miller to an extreme by stating that “deterrence will normally be irrelevant to all juveniles.” There is a big difference between holding that the less developed brain of juveniles should make it rare and difficult to give them the most serious punishment, as the Court did in Miller, and holding that it should make it rare and difficult to punish them at all, which is the gist of today’s decision.
As before, the majority draws heavily on law review articles as a basis for today’s decision. In stark contrast to how it has been received by actual courts, the court’s Lyle decision has been enthusiastically welcomed by law review writers. See, e.g., Cara H. Drinan, The Miller Revolution, 101 Iowa L. Rev. 1787, 1817 (2016); Lindsey E. Krause, One Size Does Not Fit All: The Need for a Complete Abolition of Mandatory Minimum Sentences for Juveniles in Response to Roper, Graham, and Miller, 33 Law & Ineq. 481, 493 (2015); Elizabeth Scott et al., Juvenile Sentencing Reform in a Constitutional Framework, 88 Temp. L. Rev. 675, 707-08 (2016) [hereinafter Scott].
To be clear, legal scholarship plays a vital and necessary role in germinating new concepts, fusing other disciplines to law, and knocking down badly reasoned judicial opinions. But it is one thing to regard a nonpeer-reviewed law review article as a source of ideas and quite another to regard it as authority. Unlike a court, which in a meaningful way must live with its decision, law review writers have no skin in the game. They can freely expound without bearing the responsibility for an actual decision that (like Lyle) has real-world consequences.
III. The Court Has Redefined the Miller Factors in a Way That Will Make It Practically Very Difficult to Sentence a Juvenile to Any Minimum Amount of Incarceration, Regardless of the Crime and the Characteristics of the Person Who Committed It.
Over the last three years, Lyle has led to hundreds of sentencings and resentenc-ings. District judges, prosecutors, and defense lawyers have worked countless hours to do what we asked them to do. Furthermore, the court of appeals has undertaken appellate review of numerous Lyle sen-tencings and resentencings. See, e.g., State v. White, No. 15-0829, 2016 WL 4801436 (Iowa Ct. App. Sept. 14, 2016); State v. Null, No. 15-0833, 2016 WL 4384614 (Iowa Ct. App. Aug. 17, 2016); State v. Zarate, No. 15-0451, 2016 WL 3269569 (Iowa Ct. *155 App. June 15, 2016); State v. Chany, No. 15-0340, 2016 WL 1705160 (Iowa Ct. App. Apr. 27, 2016); State v. Tuecke, No. 15-0617, 2016 WL 1681524 (Iowa Ct. App. Apr. 27, 2016); State v. Bullock, No. 15-0077, 2016 WL 1130311 (Iowa Ct. App. Mar. 23, 2016); State v. Wise, No. 15-0192, 2016 WL 894377 (Iowa Ct. App. Mar. 9, 2016); State v. Davis, No. 14-2156, 2016 WL 146528 (Iowa Ct. App. Jan. 13, 2016); State v. Giles, No. 15-0021, 2015 WL 9450810 (Iowa Ct. App. Dec. 23, 2015); State v. Hajtic, No. 15-0404, 2015 WL 6508691 (Iowa Ct. App. Oct. 28, 2015).
What our judges need and want from this court is an intelligent and practical roadmap to guide them in their sentencing decisions—that is, an illustration of a sentencing or resentencing that complies with this court’s opinions and allows them the discretion to provide appropriate juvenile offenders with a minimum period of incarceration. But the court does not provide such a roadmap. Again, this court simply redefines the Miller factors in a way that will make it extraordinarily difficult to sentence a juvenile to any minimum term of imprisonment, regardless of the individual factors related to the person or any consideration of the crime he or she committed. The majority continues to focus on the defendant’s potential for rehabilitation without giving any weight to public safety, deterrence, or incapacitation. Indeed, the majority’s analysis only uses the word “victim” when quoting the district court. These newly redefined factors are not only unfair to our district court judges, but also unworkable.
A. Chronological Age. The first Miller factor is “the ‘chronological age’ of the youth and the features of youth, including ‘immaturity, impetuosity, and failure to appreciate risks and consequences.’ ” State v. Ragland, 836 N.W.2d 107, 115 n.6 (Iowa 2013) (quoting Miller, 567 U.S. at 477-78, 132 S.Ct. at 2468). Yet, today’s opinion provides a subtle change. The word “chronological” has been dropped. So, whereas Miller specifically distinguished between the seventeen-year-old and the fourteen-year-old, and emphasized that the cases before it involved fourteen-year-olds, according to today’s opinion all ages under eighteen are a mitigating factor unless the State introduces “expert evidence [that the] offender possessed features of maturity beyond his or her years.” This renders the age factor meaningless. We do not live in a fictional world where all children are above average. If all juveniles receive the same mitigation, unless the State offers expert evidence of superannuated wisdom, then in a real sense no one receives mitigation. The fourteen-year-old cannot be treated more leniently than the seventeen- and-a-half year-old who commits the same crime.
B. Family and Home Environment. The second Miller factor is the juvenile’s “family and home environment.” 567 U.S. at 477, 132 S.Ct. at 2468. Miller asked the court to consider the juvenile’s “family and home environment ... no matter how brutal or dysfunctional.” Id. Now, instead of analyzing the extent a brutal or dysfunctional family situation “from which [a juvenile] cannot usually extricate himself [or herself],” id., the majority seeks to impose the requirement of expert testimony to “assess how the family and home environment may have affected the functioning of the offender.” Rather than allowing the district court to exercise its intellect and discretion in determining the mitigating weight of a particular juvenile’s home environment, the majority now requires expert testimony based on “social maturity scales ... [that] assess the degree of independence and self-direction in everyday functioning” in every juvenile sentencing—even if the juvenile may come from a seemingly well-functioning family background. Scott, *156 88 Temp. L. Rev. at 698. The Supreme Court’s decision in Miller focused on the extreme—a brutal or dysfunctional family environment from which a juvenile cannot extricate themselves. See Miller, 567 U.S. at 477-78, 132 S.Ct. at 2468. As mitigating evidence, the Court found relevant that Evan Miller’s stepfather abused him, that his mother was an alcoholic and a drug addict, and that he spent years in and out of the foster care system. Id. at 478-80, 132 S.Ct. at 2469. The majority takes away the district court’s ability to make an informed decision based on its own observations and perceptions. Instead of allowing a dysfunctional home environment to serve as a mitigating factor, every juvenile’s home environment must be analyzed by an expert to offer an opinion on the degree of dysfunction. Why must a juvenile’s home and family environment always count as a mitigating factor? What about the case of “affluenza” where a juvenile raised by a loving family in a wealthy neighborhood commits a heinous crime?
C. The Circumstances of the Crime and Family or Peer Pressures. The third Miller factor asks the court to consider “the circumstances of the homicide offense, including the extent of [the youth’s] participation in the conduct and the way familial and peer pressures may have affected [the youth].” Id. at 477, 132 S.Ct. at 2468. From this, we have applied the factor across the board to any crime committed by a juvenile. In the cases the Supreme Court considered in Miller, neither of the juveniles acted alone when they committed their crime, which illustrated the extent to which peer pressure can affect a juvenile in the moment. Id. at 477-80, 132 S.Ct. at 2468-69. However, the majority now asks our district court judges to analyze the extent to which peer or family pressure affected a juvenile, even when the juvenile acted alone. Scott, 88 Temp. L. Rev. at 698 (“[P]eer influence can play a more subtle role in adolescent behavior, as when teenagers engage in behavior that they think will win peer approval....”). How is a district court judge to do this? This court offers no guidance on a principled application.
The court concludes with the observation that “[mitigation normally is warranted in all crimes.” So, as with the age factor, every circumstance apparently serves as mitigation. Again, this has the unfortunate side effect of treating the juvenile who was truly pressured into committing his or her crime the same as the juvenile who committed a solo, cold-blooded offense.
D. Incompetence of Youth as It Affects the Legal Process. The fourth Miller factor considers the ways a juvenile’s age may affect his or her ability to deal with police officers, prosecutors, or their own attorney. Miller, 567 U.S. at 477-78, 132 S.Ct. at 2468. Here, too, rather than focusing on the facts of the case before it and the juvenile’s actual experience with police, prosecutors, and his attorney, the majority imposes the requirement of expert testimony to determine whether “a particular youth would be more capable than most” in navigating the legal process. While I can certainly see the benefit of expert testimony in limited circumstances, I think our sentencing judges can often look at the facts and circumstances involving the juvenile, and make an informed determination of this issue in the exercise of their full discretion, without the necessity of expert testimony.
Additionally, how is this factor to be applied when we are dealing with an initial sentencing rather than a resentencing? Once a juvenile has been convicted of, for example, a forcible felony, does trial counsel then need to present expert testimony on how the youth navigated the just-com *157 pleted trial in front of the district court judge? If so, doesn’t trial counsel need to withdraw so there can be new counsel for sentencing?
E. Rehabilitation. The last Miller factor is the juvenile’s “possibility of rehabilitation.” Id. This factor takes into consideration whether a juvenile’s actions demonstrate the transient immaturity of youth rather than “irreparable corruption.” Id. at 479-80, 132 S.Ct. at 2469 (quoting Roper, 543 U.S. at 573, 125 S.Ct. at 1197). Notably, the concept of “irreparable corruption” originated in Roper in the context of capital punishment and continued with life-without-parole sentences at issue in Miller. It really has no bearing on cases where the juvenile offender will be released after a period of years. The issue is simply whether the sentencing judge can prescribe some amount of time the juvenile must serve before being parole eligible.
Again, however, the majority cushions its language to make the district court’s job nearly impossible—it “cannot necessarily use the seriousness of a criminal act, such as murder, to conclude the juvenile falls within the minority of juveniles who will be future offenders.” This leaves the question open as to when, if ever, a district court can use the seriousness of a criminal act as anything other than a mitigating factor.
From the above review of the Miller factors, and the new restrictions and guidance provided by the majority, it seems abundantly clear that the district court still has no sensible direction as to how to effectively apply the Miller factors in its sentencing decisions. In effect, the majority is imposing a de facto, categorical ban on any minimum prison sentence for a juvenile offender, whether the underlying sentence required any mandatory sentence or not. As I and several of my colleagues have repeatedly argued, if this is the direction the court wants to take, then be direct enough to just say it. Let’s stop wasting all the time, resources, and money on a sentencing approach that is impractical and unworkable. It is a burden on our court system and a burden on our district court judges who look to our opinions for guidance.
F. Model Penal Code: Sentencing. The Model Penal Code: Sentencing has recently been drafted to submit to the American Law Institute. It specifically addresses some of the factors discussed above.
As it pertains to an offender’s age, it notes that “age shall be a mitigating factor, to be assigned greater weight for offenders of younger ages.” Model Penal Code: Sentencing § 6.11A(a), at 215. This is more in line with the mandates of Miller than today’s ruling. In Miller, the court noted that both of the defendants were fourteen years old—a different situation than if both had been seventeen. Miller, 567 U.S. at 477-78, 132 S.Ct. at 2468. The Model Penal Code approach preserves this common-sense approach, that the fourteen-year-old offender is different from the seventeen-year-old offender. It still, however, preserves the idea that juveniles of all ages are still less blameworthy than adults. Model Penal Code: Sentencing § 6.11A, cmt. c, at 217 (“[Offenders under 18 should be judged less blameworthy for their criminal acts than older offenders— and age-based mitigation should increase in correspondence with the youthfulness of individual defendants.”). Age alone, however, need not always be a mitigating factor. Id. cmt. c, at 218. “[A] sentencing judge might find an’ offender unusually culpable—despite his [or her] youth—if guilty of a violent offense committed only for a thrill, or for sadistic purposes, or out of racial animus.” Id.
*158 The Model Penal Code acknowledges that peer pressure is a concern that should be weighed, but not a mitigating factor in every case. Id. at 219.
While normally developing human beings possess a moral sense of morality from their early years, important capacities of abstract moral judgment, impulse control, and self-direction in the face of peer pressure, continue to solidify into early adulthood. The developmental literature suggests that offenders under 18 may be held morally accountable for their criminal actions in most cases, but assessments of the degree of personal culpability should be different for older offenders.
Id. at 219-20. In other words, if peer pressure is an issue in the case, it should certainly be weighed as a mitigating factor. We saw this in Miller, where both defendants acted with peers when they committed their crimes. However, the majority takes it one step too far by proposing that peer pressure is at issue in every case, even when the defendant acted alone.
The Model Penal Code also places a premium on the goal of rehabilitation for juvenile offenders. Id. at 219-21. However, it does so without foreclosing the possibility that rehabilitation will not work in every case, for every offender. Id. at 220.
Many believe that adolescents are more responsive to rehabilitative sanctions than adult offenders. While the evidence for this proposition is mixed, it is clear that some rehabilitative programs are effective for some juvenile offenders. Success rates are at least comparable to those among programs tailored to adults.
Id. While society has a “greater moral obligation” to attempt to rehabilitate juvenile offenders, common sense tells us that rehabilitation will not work for every offender.
IV". Replacing Trial Judge Discretion with Parole Board Discretion Does Not Necessarily Mean Fairer Sentences.
Lyle eliminated legislative control over how long a juvenile who committed a serious felony could be incarcerated. Today’s decision effectively eliminates judicial control over juvenile sentences by making it essentially impossible to send a juvenile who commits a crime to prison for any minimum amount of time. Now, control is vested exclusively in the parole board.
The parole board has a statutory duty to release a person under the following circumstances:
The board shall release on parole or work release any person whom it has the power to so release, when in its opinion there is reasonable probability that the person can be released without detriment to the community or to the person. A person’s release is not a detriment to the community or the person if the person is able and willing to fulfill the obligations of a law-abiding citizen, in the board’s determination.
Iowa Code § 906.4(1) (2017). In other words, the board is obligated to release an individual as soon as the individual is rehabilitated. This explains the court’s preference for parole board discretion: whereas district court judges can and do consider all the traditional goals of sentencing— including punishment and deterrence—the parole board may only consider whether the individual has been rehabilitated.
On paper, this should work in the juvenile’s favor. In practice, I am not so sure. The parole board has five members; only two of them work full-time. See id. § 904A.1. These members are responsible for making all parole decisions in Iowa. Id. § 904A.4(1). Collectively, in FY2016, they completed 11,468 deliberations resulting in *159 3767 paroles and 1611 work releases. See Iowa Bd. of Parole, Annual Report Fiscal Year 2016, https://www.legis.iowa.gov/docs/ publications/DF/804753.pdf, at 2. It is simply unfair and unrealistic to expect the parole board to devote the same time and attention, on average, to a particular offender that a district court judge does in its consideration of an appropriate sentence for a juvenile offender.
Furthermore, the parole board’s determination will be influenced heavily by the defendant’s behavior in prison, as reported by the department of corrections. See Iowa Code § 906.5(3); Iowa Admin. Code r. 205—8.6. One of the main points the court makes today is that a juvenile’s conduct as a juvenile has limited value in predicting the person’s capacity for future law-abiding behavior. According to the court, we need to see the person as an adult—i.e., how the person acts in prison. This focus on an offender’s behavior in a prison environment will benefit some defendants, but hurt others.
Additionally, there is no right to counsel at parole hearings as there was at sentencing. See Iowa R. Crim. P. 2.28(1). So the former juvenile will not have the benefit of a lawyer to help them make his or her case, as he or she did at sentencing.
Also, given this court’s view that juveniles who commit serious crimes should not face societal punishment, but only be detained until rehabilitation is demonstrated to the parole board, it makes little sense for district court judges to be concerned about the maximum time to be served. Thus, while the legislature has given courts discretion to suspend that maximum sentence in whole or in part, why make that difficult decision if the person can be released anyway as soon as the parole board deems him or her rehabilitated?
While I respect the herculean efforts of the parole board, I continue to doubt that it is a more appropriate body to determine whether a juvenile warrants incarceration rather than our district court judges.[5] Most significantly, the parole board considers a number of other factors in making its decision to release someone. Some of these factors include rule changes or overcrowding. There may be political or budgetary considerations that may affect release decisions. Therefore, these decisions may be made based on factors completely unrelated to Miller, which this court has spent considerable time and effort attempting to define—and redefine. Ultimately, I continue to believe the majority improperly delegates sentencing duties and responsibilities to the parole board, when this is a duty that is properly vested with the district court.
V. Juveniles Who Commit Serious Crimes Should Be Subject to Punishment for Those Crimes.
Throughout all of our cases on juvenile sentencing reform, we have never sought to excuse the behavior of a juveniles’ criminal act, but rather to impose punishment in a way that takes into account the lesser culpability and greater capacity for change of juvenile offenders. See, e.g., Null, 836 N.W.2d at 75 (“[Wjhile youth is a mitigating factor in sentencing, it is not an excuse.”). “The constitutional analysis is not about excusing juvenile behavior, but imposing punishment in a way that is consistent with our understanding of humanity today.” Lyle, 854 N.W.2d at 398. In other *160 words, this analysis requires that we consider both the crime and the punishment. Tying the district court’s hands by making the factors nearly impossible to apply in a principled manner disproportionately weighs the analysis so the district court is only able to consider the juvenile’s age and lessened culpability. Completely lost is any consideration of the harm the juvenile offender caused to his or her victim. Another downside to immediate parole eligibility in place of a discretionary minimum prison term is that many victims and their family members will feel compelled to attend the parole hearings to urge continued incarceration. Each hearing will reopen the wounds scarred over from the defendant’s crime and thereby revictimize the victims and their families.
There are a number of objectives that must be weighed when sentencing-an offender under the age of eighteen: “offender rehabilitation, general deterrence, incapacitation of dangerous offenders, restitution to crime victims, preservation of families, and reintegration of offenders into the law-aiding community.” Model Penal Code: Sentencing § 6.11A, cmt. (c), at 218. Proportionality • does not require that these objectives be ranked in any particular hierarchy; rather, the district court must analyze the circumstances before it and weigh the gravity of the offense and the harm done to the victim before reaching a final judgment of sentence. Id, Generally, however, rehabilitation and reintegration will have priority over the other goals'. Id. at 218-19. An exception remains for dangerous or unusual criminal offenses. Id. at 219. This is consistent with the approach we have taken in the past, where we have noted that the lessened culpability of juvenile offenders must be taken into account during sentencing, but the harm caused to a victim should not be left out of the equation. See, e.g., Lyle, 854 N.W.2d at 398. What the majority’s opinion fails to appropriately acknowledge is that “[t]he seriousness of victim injuries does not diminish when their assailants were underage.” Model Penal Code: Sentencing § 6.11A, cmt. c, at 218.
As applied to the resentencing of Christopher Roby, the district court weighed each of the Miller factors. The district court noted that Roby committed the sexual abuse against his victim when he was sixteen and seventeen years of age. Additionally, he had been caught improperly touching his victim and even banned from the victim’s house for a period of time. These factors weigh against the impetuosity and immaturity of youth. ■
The district court also considered Roby’s family and home environment. The district court noted that his family and home environment were “not the best,” but the victim’s family stepped in and attempted to provide a stable home for him. Despite this support, Roby chose to repeatedly take advantage of his victim in her home.
The district court considered peer pressure in its sentencing decision. Roby acted alone—indeed, Roby continued to pressure his victim to keep his abuse secret. Additionally, Roby was, living with the family of the victim and keeping his abuse quiet, which is the opposite of acting under peer or family pressure.
The district court did not consider Roby’s ability to deal with police, prosecutors, or his attorney on resentencing. However, his victim did not report the abuse until after Roby had turned eighteen. Because of his age, Roby’s contact with the legal system and his communication with his own attorney did not occur until he was an adult.
Last, the district court noted that Roby displayed a concerning lack of rehabilitation. Although the sexual abuse perpetrat *161 ed by Roby occurred at ages sixteen and seventeen, the district court found he expressed no remorse for his actions as an adult. Pertinently, even after ten years of incarceration, Roby maintains that the court is only punishing him and that he deserves to “get on with his life,” with no remorse or empathy for his victim.
A good indicator of Roby’s prospects for rehabilitation is his behavior in prison. He received twenty-eight disciplinary infractions before his resentencing hearing. Most troubling is his sexual misbehavior in prison after turning age twenty-five, when his brain was fully developed according to the social science relied on in State v. Bruegger, 773 N.W.2d 862, 879 n.5 (Iowa 2009). He acted out sexually by inappropriately touching a female prison guard. His inability to behave in a controlled environment, even at age twenty-five, foretells an inability to behave if he is released into society. The majority opinion does not require the sentencing court to turn a blind eye to Roby’s postsentencing behavior. In the next resentencing hearing, the State should supplement the record with Roby’s prison disciplinary history since the last hearing. The State should also update the court as to whether Roby has remained ineligible for the sex offender treatment program based on his continuing refusal to admit guilt.
On resentencing Roby, the district court imposed the identical sentence originally imposed. The court weighed the Miller factors while also recognizing the significant impact on the victim. After weighing all of the necessary factors, and noting Roby’s complete lack of remorse, the district court concluded the original sentence, including the mandatory minimum sentence, was appropriate. The district court did exactly what we asked of it. No amount of redefinition by this court, or the requirement of expert testimony on each issue, will dissuade me that the district court, in its broad discretion, entered an appropriate sentence. I would affirm the district court resentencing.
YI. Conclusion.
I am no admirer of our state’s existing mandatory minimum sentencing laws. In my view, some of the mínimums are far too long and, as a result, they treat many offenders unfairly. I would like to see our legislature revise these laws beyond the limited reforms to date. An important next step would be to reduce the mandatory minimum for most class .“B” felonies to something less than the existing seventeen and one-half years—the sentence Roby has been serving.
But my criticism of these laws is not age-specific. These sentencing laws are unfair for all ages. Amendment of these laws for everyone would be preferable to today’s decision which effectively invalidates all minimum prison terms of any juvenile offender. Unfortunately, today’s decision (1) isolates Iowa even further in this area of the law; (2) redefines the Miller factors in a way that will likely deter our district court judges from trying to impose any kind of minimum prison term on a juvenile, no matter how horrific the crime; yet (3)' may have unintended consequences that actually harm juveniles. For all these reasons, I dissent.
Waterman and Mansfield, JJ., join this dissent.

. Sweet, 879 N.W.2d at 852-53 (Zager, J., dissenting) (‘‘Last, with all due respect, I question whether the board of parole is better able to discern whether the juvenile offender is irreparably corrupt after time has passed, and after opportunities for maturation and rehabilitation have been provided.”).